SUTTON, J., delivered the opinion of the court in which KETHLEDGE, J., joined, and MOORE, J., joined in part. MOORE, J. (pp. 466-83), delivered a separate opinion concurring in part and dissenting in part. OPINION SUTTON, Circuit Judge. Virginia Caudill and Jonathon Goforth broke into Lonetta White’s home and beat her to death with a hammer when she refused to give them money to buy drugs. After ransacking her home for valuables, they wrapped her body in a carpet and loaded it in the trunk of her own car. They drove the car to an empty field, doused it with gasoline, and set it on fire. An autopsy revealed that she died from massive head injuries, including blows that caved in parts of her skull. A Kentucky jury convicted Caudill and Goforth in a joint‘trial of murder, robbery, burglary, arson, and tampering with evidence. After a mitigation hearing, the same jury sentenced them to die for their crimes. The Kentucky Supreme Court affirmed Caudill’s convictions and sentence and rejected her requests for collateral relief, Caudill v. Commonwealth, 120 S.W.3d 635 (Ky. 2003); Caudill v. Commonwealth, No. 2006-SC-000457, 2009 WL 1110398 (Ky. Apr. 23, 2009). Caudill filed a federal petition for a writ of habeas corpus, which the district court denied. Caudill v. Conover, No. 5:10-84, 2014 WL 349300 (E.D. Ky. Jan. 31, 2014). We granted a certificate of appealability to consider two questions: (1) whether the state courts reasonably rejected her Bat-son claim, and (2) whether her lawyers provided ineffective assistance by choosing not to call additional witnesses during the penalty phase. Neither claim has merit, and accordingly we must affirm. I. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), sets forth a three-step process for assessing whether a peremptory challenge violates the Equal Protection Clause of the Fourteenth Amendment. Step one: the defendant must make a prima facie showing of discrimination. Step two: the prosecutor must offer a nondiscriminatory reason for the strike. Step three: the trial court must “determine if the defendant has established purposeful discrimination.” Id. at 96-98, 106 S.Ct. 1712. Caudill’s lawyer raised a Batson challenge toward the end of the state court’s jury selection. Here is the key exchange: [DEFENSE COUNSEL]: I guess we would have a motion evaluating, uh, I believe there were nine strikes for the Commonwealth. They struck eight males. I believe that, uh, there’s uh— shows a clear bias against, uh, uh, men in this case, possibly because of the woman on trial here. And I just feel that, uh, it rises to the same level as a Batson issue— [PROSECUTOR]: Are you saying men are a- protected class? Is that what you’re saying? [DEFENSE COUNSEL]: Yes. [THE COURT]: White males? [DEFENSE COUNSEL]: Well, I don’t know if they’re— . ■ [PROSECUTOR]: That’s news to the rest of.us. [DEFENSE COUNSEL]: Well, we would just— [THE COURT]: Never had men. The only people excluded were white males. [DEFENSE COUNSEL]: Look, well; we just for the record make that motion. [THE COURT]: I understand. DVD A-4 at 09:12:33-09:13:23. In response, the prosecutor gave the following reasons for striking' the eight potential jurors. Robert Feezor opposed the death penalty. Nicholas Edwards had only a grade school education and did not' “underst[an]d what was going on.” Shannon Patterson had relatives in prison and serious hesitations about the death penalty. James Franks seemed “uncomfortable” with the death penalty and came off as “a little strange." Robert Biene hated the police and the judicial system. Robert Keston did not like the death penalty and was “practically a blood brother” of Caudill’s lawyer, Gary' Lloyd said that he would impose the death penalty only in rare circumstances. And the prosecution doubted that they could persuade William Case of the defendants’ guilt or persuade him to impose the death penalty. Id. at 09:13:23-09:16:54. After listening to these explanations, the trial court found no discrimination afoot. “[I]f the appellate courts for whatever magical reason perceive white male's to be a protected class, I think these are nondiscriminatory reasons that would allow them to be struck.” Id. at 09:16:54-09:17:15. The defense neither objected to the substance of the court’s ruling nor asked for an opportunity to show that the prosecutor’s explanations did not add up or otherwise amounted to a smokescreen for discrimination. On direct appeal, the Kentucky Supreme Court held that “[t]he trial judge found all of [the prosecutor’s] reasons to be race-neutral and we are unable to conclude that his finding in that regard was clearly erroneous.” Caudill, 120 S.W.3d at 657. The parties agree that the Kentucky Supreme Court decided Caudill’s Batson claim on the merits. And so do we. That means we may grant Caudill’s petition only if the state court’s rejection of this claim “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)., In trying to meet this standard, Caudill-focuses on the trial court’s handling of Batson’s third step. At that stage, she points out, Batson requires courts to undertake “a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,” 476 U.S. at 93, 106 S.Ct. 1712, and the trial court’s explanation, she elaborates, was neither sensitive nor careful, as it took less than three seconds and gave defense counsel little, if any, chance to respond. Although the trial court did not use a model method for resolving the Batson claim, Caudill’s argument nonetheless fails. We need not decide whether the U.S. Supreme Court has “clearly established” that Batson applies in this setting. Either way, Caudill’s- claim fails because she makes too much of the “sensitive” inquiry language in Batson, at least in the context of a habeas claim. The Supreme Court has never directed trial courts to make detailed findings or to solicit the-defense attorney’s views before ruling on a Batson motion. Batson itself “decline[d] ... to formulate particular procedures to be followed” beyond the three-step framework. 476 U.S. at 99, 106 S.Ct. 1712. On reflection, that is not surprising. Some Batson claims will be stronger than others. And some claims thus will deserve more process or more consideration or more argument than others. The amount of such deliberation will invariably turn on the circumstances of each case. Id. at 97, 106 S.Ct. 1712. The more flexible a standard, as this one surely is, the more difficult it Ml be to show an unreasonable violation' of it. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The Kentucky Supreme Court did not unreasonably apply Batson here. Jury selection lasted several days. The state court judge was there, the entire time. He had ample opportunity to observe the demean- or of the jurors and hear their answers. He listened to the prosecutor’s questions during voir dire and watched the strikes. By the time he entertained Caudill’s Bat-son challenge, he had plenty to go on in deciding how to respond. He also had the prosecutor’s race-neutral explanations to consider. It thus is inaccurate, and unfair to the state judge, to say that he thought about the Batson claim for just “three seconds.” Appellant’s Br. 25. He had ample time to think about and to gauge this claim throughout this process. Yes, the state court would have done well (and would have done better) to explain more fully why the prosecutor’s explanations convinced him that no discrimination of any sort was at play. But his ruling did not violate any clearly established law. Caudill insists- that the nature of some of the prosecutor’s explanations made it impossible for the trial court to evaluate the prosecutor’s credibility so quickly. She points out that the prosecutor struck Edwards because he had a “grade school education.” Appellant’s Br. 27: Because Edwards never discussed his education at voir dire, the only way for the trial judge to confirm that explanation was to look at Edwards’ juror questionnaire. That he didn’t do so, she says,' suggests that he abdicated his duties under step three of the Batson inquiry. But the prosecutor struck Edwards for another reason too: The potential juror did not “underst[an]d what was going on.” The judge could have credited that explanation. And reasonably so: Edwards initially told the prosecutor that he could impose the death penalty. Then, when questioned by defense counsel, he claimed to be against it. Then, when the prosecutor on redirect noted his inconsistent answers, Edwards' responded incoherently. After the prosecutor asked him to: describe circumstances that would warrant the death penalty, Edwards responded: “Um, it means just like whatever the crime is, I mean, you know. Like if it’s a—I don’t know. I can’t explain.” R. 47-3 at 14. Through it all, the prosecutor and the judge at any rate were right: Caudill concedes that Edwards indeed had just a grade-school education. Oral Arg. Tr.' 19:20-19:29. Caudill adds that the prosecutor exaggerated in -explaining why he struck Ke-ston and Lloyd. She notes that Keston was not actually a “blood brother” of one of Caudill’s attorneys. Appellant’s Br. ,30. And Lloyd never said that he would “very rarel/’ impose the death penalty. Id. at 31, The judge’s failure to catch these overstatements shows that he failed to conduct a proper Batson inquiry, she -claims. . But that is an overstatement of its own. The prosecutor gave a second reason for striking Keston, namely that he generally did not approve of the death penalty. That’s what Keston said at voir dire: “in most circumstances ... I wouldn’t support [the death penalty].” R. 47-2 at 33. True enough, Lloyd never said he would “very rarely” impose the death penalty. But he did say that he “d[idn’t] know” how he felt about the death penalty, that it would be “more difficult” for him to impose it, and that he was concerned about “people on death row who had been found innocent of the crime they were there for.” R. 47-3 at 5-6. The prosecutor’s failure to recall Lloyd’s exact words does not show that the substance of his objection was false. The trial court, to repeat, would have done well to say more in explaining why the prosecutor’s strikes were not discriminatory. But the Supreme Court has never clearly established a more rigorous procedure at this stage of the Batson inquiry. And the Kentucky Supreme Court did not unreasonably apply what the Supreme Court has required in concluding that the trial court complied with Batson. The district court correctly rejected this claim. II. Caudill claims that her lawyers provided ineffective assistance at the penalty stage of her trial by failing to interview and call more witnesses. To prevail on this claim, Caudill must do two things. She must establish a Sixth (and Fourteenth) Amendment violation—that her lawyers performed well below the norm of competence in the profession and that this failing prejudiced her case. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). And she must satisfy AEDPA—by showing that any rulings by the state courts on the merits of this claim were unreasonable. 28 U.S.C. § 2254(d). A. Caudill’s lawyer called seven witnesses at the penalty phase, including her mother, her only brother, her only sister, and her daughter. The jury learned from them that Caudill’s father was an alcoholic who physically and emotionally abused the family. R. 47-10 at 37 (testimony of mother); id. at 47 (brother); id. at 50 (sister). They learned that Caudill and her siblings were “scared to death” of their father and would sometimes hide at their grandparents’ house. Id. at 37 (mother). They heard that Caudill was bullied because of her weight, id. at 38 (mother); id. at 50 (sister), and that Caudill had serious problems with drug and alcohol addiction, id. at 38-39 (mother); id. at 46 (brother); id. at 52 (sister); id. at 54 (daughter). And they heard that, when Caudill was sober, she was “loving and kind,” id. at 47 (brother), “the most wonderful daughter,” id. at 39, and a “great” mother, id. at 54. Some witnesses broke down in tears as they testified, and above all they conveyed the toll that physical abuse and substance abuse had taken on Caudill and the impact they had had on her conduct. Id. at 47-48. Dr. Peter Schilling, a psychologist, provided the most detailed testimony. The emotional and physical abuse Caudill suffered as a child at the hands of her father, he explained, distorted the way she interacted with men. Id. at 95. She sought out “abusive, dominating-type” men and had a submissive personality. Id. As evidence, Dr. Schilling provided the jury with detailed information about Cau-dill’s past relationships. Caudill married her first husband when she was just a teenager, and she was so submissive that she “allowed the man to lead her out of the state.” Id. at 96. That marriage ended when the man threatened to kill her. Id. None of her other relationships fared much better. Dr. Schilling testified that Caudill had been “hit in the face by men ... more times than she cfould] remember.” Id. at 97. Her second husband once “took a pipe and busted out the window of her ... vehicle.” Id. at 96. Thomas Garrett, one of her boyfriends, “broke her wrist, nose and jaw at various times,” “repeatedly struck her face,” and was “so dysfunctional” that he eventually killed himself. Id. at 97. Another boyfriend knocked her out cold. Id. At one point, a businessman coaxed Caudill into haring sex with clients in exchange for money and access to a condo. Id. at 97-98. What is more, personality tests confirmed that Caudill was “about as submissive as you can get.” Id. at 107. Other tests suggested that Caudill had a learning disability, extensive brain damage from head trauma and drug abuse, or all of the above. Id. at 101-02. And while Caudill had a normal IQ and scored in the “gifted” and “genius” ranges in some areas, she scored well below average in other measures,of intelligence. Id. at 100-01. All of this testimony showed two things: that Caudill was a different person when alcohol and drugs took over, and that her traumatic experiences with her father made her susceptible to manipulation by men. The first theme implicated one theory for leniency: Why impose the death penalty on Caudill when she is fundamentally a good person whose family loves her and who merely needs to escape the lure of addiction? The second theme implicated another theory for leniency: Why impose the death penalty on Caudill when a cruel and malicious father made her susceptible to being duped into foolish behavior by a string of men, ending with Goforth? Caudill faults her lawyers for failing to do more, noting that this testimony was “nonspecific” and “generic.” Reply Br. 10-11. Had her lawyer been more diligent, she adds, he would have discovered other witnesses who could have painted a “more vivid picture.” Id. at 18. Here are the other witnesses and here is what they would have said in abridged form: • Ruth Brown, Caudill’s neighbor, would . have testified that she witnessed Cau-dill’s father chasing her mother down the railroad tracks and shooting at her with a rifle. • Vina Caudill, Caudill’s grandmother, would have testified that she feared for the lives of her daughter-in-law and her grandchildren. • Barbara Watson, Caudill’s second cousin, witnessed Caudill’s father threaten her mother. • Ray Towery, one of Caudill’s friends, would have testified about Caudill’s relationship with a former boyfriend, Eddie Stallworth. Towery saw Stall-worth physically abuse her and encourage her “to begin prostituting.” At one point, Towery had to intervene to stop Stallworth from beating Cau-dill. RCr 11.42 App. at 608-10. • Mike Sipple, a former boyfriend, would have testified that “Virginia is dependent on men” and addicted to drugs. Id. at 612. • Ray Hopkins, another former boyfriend, would have testified that he physically abused Caudill. At one point, he notes, he “backhanded Virginia so hard that she became unconscious.” Id. at 615. He also would have told the jury that Caudill called the police several times out of.fear. • Billie Davenport, a social worker, would have testified that Hopkins abused Caudill and threatened to kill her with a knife. On top of these lay witnesses, Caudill says that her lawyer should have called Dr. Allen,' a second expert witness. He would have testified that Virginia had “probable cerebral brain damage” from years of heavy drug abuse and head trauma. Id. 681. The Kentucky Supreme Court held that Caudill’s lawyers did not violate the Sixth (and Fourteenth) Amendment by failing to call these additional witnesses. It reasoned that the existing witnesses adequately presented this information and these mitigation themes. In its view, “[djefense counsel’s investigation and presentation of taitigation evidence in this case revealed Caudill’s abusive childhood, her substance abuse issues, her violent relationships with males, and her cognitive deficiencies.” Caudill, 2009 WL 1110398 at *5. “That additional witnesses existed who would have corroborated or expanded upon -this testimony,” the court concluded, “does not amount to deficient performance by counsel.” Id. B. Deficiency, The state court resolved the deficiency prong of Caudill’s ineffectiveness claim on the merits. That means we must deny Caudill’s petition unless the state court’s decision “was contrary to, or involved an unreasonable application of, clearly established Federal law,” or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). Caudill maintains that the state court’s decision involved an unreasonable application of law. But a state court’s decision on the déficiency prong satisfies that requirement only if there is no reasonable argument that counsel met Strickland’s deferential standard. Harrington v. Richter, 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Caudill cannot meet that imposing standard. Start with the proposed testimony of other relatives and friends. ■ “[T]here comes a point at which evidence ■ from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.” Bobby v. Van Hook, 558 U.S. 4, 11, 130 S.Ct., 13, 175 L.Ed.2d 255 (2009) (per curiam). Just so here. Having already discovered evidence of Caudill’s abusive childhood, substance abuse problems, and abusive relationships with men, her lawyer had no constitutional obligation to identify and interview distant relatives, former childhood neighbors, past boyfriends, and acquaintances who would provide similar information. It was reasonable for her lawyer to assume that those closest to Caudill—her immediaté family—would have the most detailed information about her life, and would provide the most compelling testimony as a-result. That’s particularly so given the reality that her family still cared for her and loved her. Only alcohol and drugs, particularly crack cocaine, had an estranging effect on the family. When under the influence drugs or alcohol, Caudill was one type of person. When not, she was another. It’s difficult to maintain that more distant relatives and other friends could have conveyed this theme more powerfully than her own mother, her two siblings, and her daughter. So too was it reasonable for Cau-dill’s lawyer to rely on Dr. Schilling, rather than her former boyfriends, to convey the abuse she suffered at their hands. Only Dr. Schilling could connect the dots about •how Caudill’s abusive childhood led to her submissive personality, which led to her tendency to associate with violent and controlling men like Goforth. No lay witness could have conveyed this theory as persuasively. Nor was there reason at the time to think her former boyfriends would provide useful testimony. After all, her former boyfriends ‘“would have had no particular reason to be favorably predisposed toward’ admitting their own abuse.” See infra at 480 (quoting Skipper v. South Carolina, 476 U.S. 1, 8, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)). With Dr. Schilling’s testimony in hand, it was reasonable to devote resources in more promising directions. Van Hook illustrates the point. Van Hook’s lawyer presented evidence of Van Hook’s traumatic childhood, substance abuse, and personality disorder. Van Hook, 558 U.S. at 10-11, 130 S.Ct. 13. But he failed to interview other family members who “could'have helped his counsel narrate the true story of Van Hook’s childhood experience.” Id. at 11, 130 S.Ct. 13. The Court held (under fresh review no less) that there was nothing wrong with the lawyer’s decision not to seek more mitigation evidence about the defendant’s background than he already had. Id. at 11-12, 130 S.Ct. 13. Having already unearthed evidence “from those closest to Van Hook’s upbringing and the experts who reviewed his history,” the lawyer was under no duty to “identify and interview every, other living family member or every therapist.” Id. at 11, 130 S.Ct. 13. The same conclusion applies here—and doubly so because AED-PA deference applies. Nor was her lawyer incompetent for failing to call a second expert; Dr. Allen. In truth, Dr. Allen’s testimony had the potential to do more harm than good. Dr. Allen’s report said that Caudill denied that her father abused her or her siblings. This contradicted a key (and, it seems to us, powerful) theme of her mitigation case. Because Dr. Schilling had already testified about Caudill’s brain damage, her lawyer reasonably could conclude that calling Dr. Allen wasn’t worth the risk of undermining this other mitigation testimony. We presume the reasonableness of such strategic decisions. Cullen v. Pinholster, 563 U.S. 170, 189, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). Caudill claims several cases lead to • a different conclusion. None helps. Most of the cases involve counsel’s failure to interview anyone. See, e.g., Porter v. McCollum, 558 U.S. 30, 39, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (per curiam); Wiggins v. Smith, 539 U.S. 510, 525, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); Foust v. Houk, 655 F.3d 524, 536 (6th Cir. 2011). That situation presents a difference in kind, as a complete failure to investigate is different from failing to .“dig deeper.” Foust, 655 F.3d at 536. Neither is this case like Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), in which the lawyers failed their client because they did not discover mitigating evidence in Rom-pilla’s criminal records even though the State notified them that it intended to seek the death penalty by proving that Rompilla had a long history of felony convictions. Id. at 383-84, 125 S.Ct. 2456. Caudill points out that the Kentucky Supreme Court incorrectly said that Cau-dill’s "mother, brother,, and sister all gave details of Caudill’s history with abusive men. That was a mistake, true enough. But it was a stray one. And. the misstatement had little import given the other evidence on this score and the court’s other explanations for its decision. That presumably explains why Caudill does not argue that the court’s decision was “based on an unreasonable determination of the facts.” 28 U.S.C, § 2254(d)(2). All in all, the state court did not unreasonably apply Strickland’s deficiency prong. Prejudice. Even if Caudill could show that her trial lawyers were unconstitutionally incompetent, she also must demonstrate that “there is a reasonable probability” that, but for that incompetence, “the result” of the mitigation hearing “would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. We give fresh review to this part of her claim because the Kentucky Supreme Court did not address it. To show prejudice, Caudill must point to evidence that “differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.” Hill v. Mitchell, 400 F.3d 308, 319 (6th Cir. 2005). That did not happen. Towery, Hopkins, and Davenport, all proposed new witnesses, would have testified about the abuse Caudill suffered at the hands of her boyfriends. But Dr. Schilling testified extensively about that kind of abuse. Sipple, another proposed new witness, would have said that Caudill was submissive and dependent on men. But Dr. Schilling had something better: personality tests showing the same thing. Brown, Watson, and Caudill’s grandmother, still more new witnesses, would have told stories about Caudill’s father. But those stories merely elaborate on testimony given by Caudill’s mother, brother, and sister. In considering the potential prejudice of omitting this additional testimony, it’s important to keep in mind the State’s evidence on the other side of the scale. Wong v. Belmontes, 558 U.S. 15, 27, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (per curiam). Caudill and Goforth were undoubtedly guilty. When the police tried to question the pair, they fled. When police caught the pair, they confessed. Both admitted that they were present during the murder—but neither admitted who put the hammer to White’s skull—and the undisputed evidence showed that both defendants disposed of the body by wrapping it in a carpet, putting it in a car, and burning the car. Considerable evidence, moreover, suggested that Caudill, not Goforth, was the mastermind. Caudill dated White’s son, and White gave Caudill money many times before. Jeanette Holden testified that, shortly before the murder, Caudill mentioned that she knew how to get “some money” to buy drugs and asked her if she was “down for hurting somebody.” R. 47-7 at 25-26. Julia Davis and Cynthia Ellis, two jailhouse informants, told the jury that Caudill confessed to being the killer. And Davis indicated that Caudill felt little remorse for her actions and, ruthlessly to the contrary, found them funny. “Help me, help me, why are you doing this to me?” she would frequently say while imitating White—a 73 year-old woman who had supported her and given her money before— as she lay dying from her wounds. Id. at 255. For what it is worth, the record in front of the state court confirms that at least some jurors thought that Caudill was the aggressor rather than the dupe. An alternate juror who sat during the guilt phase of the trial stated in a post-verdict interview that he “believed much of what Go-forth said on the stand to pin the murder on Caudill”—that Caudill “exploded” when White refused to “give her money” to buy drugs. RCr 11.42 App. at 712. Another juror who sat during both the guilt and penalty phases stated that she thought “Caudill [was] more culpable” and that “Caudill hit the victim first and then passed the hammer to her co-defendant.” Id. at 706. All evidence considered, the proposed new witnesses had no realistic possibility of changing the verdict. At bottom, Caudill and Goforth murdered Lonetta White for drug money. Instead of facing the consequences of their actions, they torched her body to eliminate evidence and went on the run. And instead of showing remorse for her deeds, Caudill ridiculed the way in which White begged for mercy. The jury did not sentence Caudill to die because her lawyers were incompetent. They did so because of her actions. Caudill and the dissent resist this conclusion on the ground that the evidence her lawyer failed to find was stronger than the evidence he found. The jury merely heard, they insist, that Caudill’s father “drank a lot” and “[w]hen he drank he was ‘mean.’” Appellant’s Br. 61-62; infra at 475-76. But that understates things. The jury heard from Caudill’s mother that Caudill’s father was much more than a mean drunk; he “was abusive to me, he was abusive to the children, and he was physically and mentally abusive,” she said. R. 47-10 at 36. They heard similar testimony from Caudill’s brother, her sister, and Dr. Schilling. And the jurors didn’t just hear that the children were “scared” of their father. Infra at 466-68. They heard that the children were “scared to death” of him, so much so that they would hide or run away when he came home drunk. R. 47-10 at 36-37. Some of the witnesses, to be sure, might have painted an even more detailed picture of the abuse Caudill suffered. But this argument is of a piece with the one rejected in Van Hook. There, a panel of this court held that Van Hook was prejudiced by his lawyer’s failure to seek out “available family members willing to help tell his story” through “first-hand accounts,” including a story about how “his father tr[ied] to kill his mother.” Van Hook v. Anderson, 560 F.3d 523, 529 (6th Cir. 2009). But the Supreme Court turned that argument aside because the trial court was “already aware that [Van Hook’s] father had a violent nature.” 558 U.S. at 12, 130 S.Ct. 13. We should not make the same mistake twice. That leaves one loose end. In addition to faulting her lawyer for failing to call more witnesses, Caudill accuses him of failing to prepare the witnesses who testified. But she never asked us to grant a certificate of appealability on that claim. A.R. 10 at 40-54. We may not consider it now. See Hill, 400 F.3d at 332. For these reasons, we affirm.