RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

BENNY LEE HODGE,

                 *Petitioner - Appellant*,

    *v.*

LAURA PLAPPERT, Warden,

                 *Respondent - Appellee*.

No. 17-6032

─────────────

On Petition for Rehearing En Banc.
United States District Court for the Eastern District of Kentucky at Pikeville.
No. 7:13-cv-00005—David L. Bunning, District Judge.

Argued En Banc: October 30, 2024

Decided and Filed: May 7, 2025

Before: SUTTON, Chief Judge; SILER, MOORE, CLAY, GRIFFIN, KETHLEDGE, WHITE, STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, MURPHY, DAVIS, MATHIS, BLOOMEKATZ, and RITZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, for Appellant. Matthew F. Kuhn, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Appellee. **ON SUPPLEMENTAL BRIEF** Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, Luke P. Ihnen Chavis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Matthew F. Kuhn, Jacob M. Abrahamson, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Appellee.

      BUSH, J., delivered the opinion of the court in which SUTTON, C.J., and SILER, GRIFFIN, KETHLEDGE, THAPAR, LARSEN, NALBANDIAN, READLER, MURPHY, DAVIS, MATHIS, BLOOMEKATZ, and RITZ, JJ., joined. NALBANDIAN, J., (pp. 27–30), delivered a separate concurring opinion in which GRIFFIN and THAPAR, JJ., joined. BLOOMEKATZ, J. (pp. 31–33), delivered a separate concurring opinion. WHITE, J.,

(pp. 34–47), delivered a separate opinion concurring in part and dissenting in part in which MOORE, CLAY, and STRANCH, JJ., joined.

————————————

**OPINION**

————————————

JOHN K. BUSH, Circuit Judge.  Benny Lee Hodge sits on death row for the brutal murder of Tammy Dee Acker.  In this habeas appeal, we address whether Hodge is entitled to relief based on claims of ineffective assistance of counsel, jury tampering, and jury bias that allegedly arose during his Kentucky state court trial.  Hodge procedurally defaulted the latter claim, so it is not properly before us.  For Hodge's ineffective-assistance argument, we review the Kentucky Supreme Court's postconviction decision under *Strickland v. Washington*, 466 U.S. 668 (1984).  For his jury-tampering allegation, we review the state court's determination of no credible evidence evincing such misconduct.

We address both claims by applying § 104 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), codified in relevant part at 28 U.S.C. § 2254(d).  That statutory provision directs us not to decide how we would have ruled on the pertinent issues in the first instance, had we sat on the state appellate bench.  Rather, we apply AEDPA's mandated deference to the state court decision to determine (1) whether the Kentucky Supreme Court's constitutional interpretation and application were objectively unreasonable, and (2) whether it engaged in objectively unreasonable postconviction fact finding.  We answer no to both inquiries.  Therefore, we **AFFIRM** the district court's denial of the writ of habeas corpus.

**I. BACKGROUND**

**A.     The Crime**

Courts have described Hodge's crime as "heinous," "brutal," "vicious," "calculated," and "exceedingly cold-hearted."  *Hodge v. White*, No. CV 13-5-DLB-EBA, 2016 WL 4425094, at *28 (E.D. Ky. Aug. 17, 2016); *see Hodge v. Commonwealth*, No. 2009-SC-000791-MR, 2011 WL 3805960, at *4 (Ky. Aug. 25, 2011).  It was.

In the early evening of August 8, 1985, Hodge joined Donald Bartley and Roger Epperson to rob Dr. Roscoe Acker at his home in Fleming-Neon, Kentucky. The 77-year-old widowed physician kept a large amount of cash in a locked safe at his house. He and his late wife, a nurse, had saved the money over almost 40 years of marriage before she died of cancer. Prior to the crime, Dr. Acker's home had been "cas[ed]" by at least one of the robbers "for three or four years." R.27-7, PgID# 4039; R.27-5, PgID# 3914. The men had their sights on that safe.

If the crime spree had stopped with the contents of the safe, this death-penalty habeas appeal would not be before us. But Hodge and his accomplices decided beforehand that they would "leave no witnesses." R.27-7, PgID# 4042. In particular, Hodge made sure that Dr. Acker's daughter, Tammy Dee Acker—at home to take care of her mourning father and preparing to return to college the next day—would never leave the house again alive. Hodge later told his cellmate that it was "the smart thing to do" to "kill all witnesses when you commit any crime so nobody can testify against you." R.27-5, PgID# 3915.

The evening of crime began with a white-collar ruse. After surveilling Dr. Acker's home and nearby medical office for three days, Hodge and Bartley rang the doorbell of the residence around 6:30 p.m. Epperson had met Dr. Acker before, so he stayed back in the car. Hodge and Bartley wore suits and appeared neatly groomed. Their looks facilitated their con: they claimed to be FBI agents when Tammy answered the door. They carried a briefcase, a .41 magnum revolver, a .38 police revolver, badges, and IDs—"the whole nine yards." R.27-7, PgID# 4048–49. They said they needed to ask Dr. Acker "a few questions" about someone they were investigating. R.27-7, PgID# 4041. Tammy responded that her father was away, so the men said they would return later. Hodge and Bartley then rejoined Epperson in their car, where they staked out the home for a few more hours.

When the doctor came home from work later that evening, Hodge and Bartley resumed their detective disguise. This time, Tammy answered the doorbell through the home's intercom system. Hodge and Bartley again identified themselves as FBI agents there to speak to her father. Dr. Acker came out onto the front porch, where the visitors asked him for a written statement about a previous business acquaintance. Believing the posers to be who they said they were, Dr. Acker eventually led them inside his home after some coaxing by Hodge. Hodge also

told Dr. Acker that someone needed to witness his statement. At her father's behest, Tammy agreed to serve that role.

But what Tammy witnessed was far from what she had expected. The pretenders dropped their disguises when Hodge pulled out a gun. He held the physician at gunpoint and ordered Bartley to tie Tammy up. Bartley did as Hodge directed, grabbing the young woman, carrying her to the back room, and binding her there. She begged him, "please don't hurt my Dad. My mother has just died." R.27-7, PgID# 4046. Despite promising her that "[e]verything is going to be all right," Bartley gagged her, put a cloth shirt over her head, and left her lying face down on the floor. R.27-7, PgID# 4046–47. He then returned from Tammy's room to the kitchen. There, Hodge continued to train his gun on Dr. Acker as Bartley tied him up, covered his head with a sheet, and forced him onto the floor.

At some point, Hodge and Bartley radioed Epperson in the car to come inside. He did so, and the three proceeded to "ransack[]" the Acker home until finding the safe. R.26-12, PgID# 3300. At about that time, Dr. Acker suffered a blow to the ribs before being asked for the combination, which he gave. But the robbers still could not open the safe. So they dragged Dr. Acker to the vault and forced him to do it. Inside were stacks of cash—nearly $2 million in total—along with jewelry and guns.

The intruders then replaced the sheet they had removed from Dr. Acker for him to unlock the safe. Tammy's head remained covered. But the assailants believed the Ackers had seen too much. Epperson asked, "which one do you want, brother?" R.27-7, PgID# 4051. Hodge responded, "it don't matter to me. I'll take the girl," and went to Tammy's room. R.27-7, PgID# 4051. Whatever Hodge did, Tammy survived. Hodge returned and told his accomplices, "she's not dead." R.27-7, PgID# 4053. So, he grabbed a stainless-steel butcher knife that Epperson had handed him from the kitchen and returned to Tammy's bedroom, where she was still bound and gagged.

Hodge stabbed Tammy at least 10 times. The "superficial" slices tore through her ribs and other cartilage. R.26-16, PgID# 3499. The deeper cuts pierced her lungs, liver, and diaphragm, exiting through her breast and stomach. Hodge drove the blade into the center of

Tammy's back and completely through her body three times.  Hodge later told Epperson the knife had gone "all the way through her to the floor."  R.27-8, PgID# 4064.  That's how Hodge confirmed his victim was dead.

Tammy died of hemorrhage from the stab wounds.  A pathologist testified to the "considerable amount of force" the killing would have required.  R.26-16, PgID# 3494–95.  Paramedics found her body in a semi-fetal position with wounds around her neck and breast.  Lodged in her back was the butcher knife.

Tammy was not the only victim.  While Hodge stabbed Tammy, Bartley sought to kill Dr. Acker.  He used the electrical cord from a curling iron to choke the physician until he lost consciousness.

After committing their crimes at the Acker home, Hodge and his cohorts fled for Florida.  They thought they had left no eyewitness alive.  But they were wrong.  Dr. Acker survived the strangulation and even an accompanying heart attack.  Hodge later recounted, per his cellmate's testimony, that "the f*cker didn't die"—"they tried to kill him," and "strangled him . . . but the f*cker didn't die."  R.27-5, PgID# 3917.  But it wasn't Hodge's "fault" that Dr. Acker survived.  The cellmate testified that Hodge told him, "I did mine right and she died."  R.27-5, PgID# 3917.

The doctor regained consciousness in a pool of his own blood, only to experience the horror of finding Tammy lifeless in the corner of her room with a "butcher knife protruding out of her back."  R.26-12, PgID# 3301; R.26-14, PgID# 3409.  His daughter who had "stayed with [him] that school year to take care of [him] because she loved [him]," was dead.  R.26-12, PgID# 3303.  The doctor consoled himself by saying that "she was in God's hands" now.  R.26-12, PgID#3301.

A few days later, Hodge and his accomplices reached Daytona Beach.  There, they went on a spending spree with Dr. Acker's money, as they had done along the way, buying expensive vehicles and luxury goods.  While bragging about his crimes, Hodge later told his cellmate that he had stacked some of the stolen cash very high on a bed to have sex with a woman on top of it.

Eventually FBI agents, with the help of a SWAT team, arrested the three fugitives. Law enforcement discovered Hodge in a van that had been purchased with robbery proceeds. One of Dr. Acker's stolen guns rested on the van's middle console. On the rear seat lay a gold wristwatch, a receipt for a 14-carat gold chain, a .22 magnum four-shot revolver, a .243-caliber rifle, and a designer tote bag. Inside the bag, police found a .38 special caliber derringer, Remington .45 auto-caliber ammunition and cartridges, a police call radio guide, and a police channel scanner.

At the time of his arrest, Hodge carried $2,350 in cash along with a butterfly knife in his pockets. He worried about losing his stolen money. Hodge asked the arresting officer, "my wallet is in the van, can I get it?" R.27-2, PgID# 3780. The officer responded no and that he was "seizing it as evidence" after seeing it was "loaded with money." R.27-2, PgID# 3780; R.27-3, PgID#3852. There was $12,437 in cash inside.

**B.      State Trial Proceedings**

Following their extradition from Florida, Hodge and his accomplices faced prosecution in Letcher County, Kentucky. *See Hodge v. Commonwealth*, 68 S.W.3d 338, 341 (Ky. 2001). A grand jury indicted Hodge and Epperson on four charges: (1) murder of Tammy Acker, (2) attempted murder of Dr. Acker, (3) first-degree robbery, and (4) first-degree burglary. *Hodge*, 2016 WL 4425094, at *2. They were tried together in Letcher County Circuit Court in 1986. Bartley agreed to cooperate with the prosecution and gave a detailed statement identifying Hodge and Epperson as the crimes' principal perpetrators. Other testifying witnesses included Dr. Acker, the arresting police officers, and one of Hodge's cellmates.

The jury convicted Hodge and Epperson of all charges. *See id.* at *3. The jury recommended that each man receive 60 years' imprisonment for the non-capital charges and a death sentence for Tammy's murder. The trial court imposed those recommended sentences. *Id.*

**C.      Sentencing Mitigation Facts**

Hodge's trial counsel made limited mention of evidence in his favor during his sentencing. Hodge's mitigation case at the penalty phase consisted of just a two-sentence

stipulation: he had "a loving and supportive family—a wife and three children," and "a public job work record." *Hodge*, 2011 WL 3805960, at *2.

Hodge points to mitigating evidence not presented by his trial counsel that showed a "childhood marred by the 'most severe and unimaginable level of physical and mental abuse.'" *Hodge v. Jordan*, 12 F.4th 640, 643 (6th Cir. 2021) (quoting *Hodge*, 2011 WL 3805960, at *5). Hodge's mother, Kate, was married to six men over the years. All were substance abusers, and some were physically abusive. One named Billy Joe was the worst offender and considered a "monster." *Hodge*, 2011 WL 3805960, at *3. His rage was "explosive and violent," mainly triggered by Kate showing affection toward her children. *Id.* Billy Joe regularly raped Hodge's mother, beat her, and threatened her with a gun. He assaulted her so violently that she suffered a miscarriage. *Id.* Hodge and his sisters often thought their mother had been beaten to death. As the only male child, Hodge tried to defend his mother. But Billy Joe regularly beat Hodge with a metal buckled belt. And he kicked and threw Hodge against walls. Billy Joe even rubbed Hodge's face in his own feces and made Hodge watch him kill Hodge's dog. *Id.*

Young Hodge turned to a life of crime. He began stealing at 12. At 15, a court sentenced him to a juvenile detention facility, where he suffered regular beatings. *See id.* at *4. He ran away from the facility twice. When he was released at 16, he assaulted his stepfather and was sent to a juvenile facility for two more years. By age 20, Hodge had pleaded guilty to his first felonies: burglary and grand larceny. Then he was convicted of a separate armed robbery. As an adult, Hodge continued attempting to escape from incarceration. By the time he committed the murder in this case, Hodge was 34, had been married three times, and had fathered three children. *Id.*

**D.    Procedural History**

Over the decades, Hodge's execution has been delayed through multiple proceedings challenging many aspects of his trial and sentencing. In fact, Benny Hodge has outlived his murder victim, Tammy Acker, by almost 40 years. And he has outlived Dr. Acker, who died in 2001, by nearly a quarter century.

The appeals began in 1986, after the entry of the judgments of conviction and death sentences for Hodge and Epperson. Both defendants appealed. *See Epperson v. Commonwealth*, 809 S.W.2d 835 (Ky. 1990). In 1990, the Kentucky Supreme Court examined the issues that the defendants raised, 62 for Hodge and 69 for Epperson. *See id.* at 837. Neither Hodge nor Epperson prevailed on any of their claims. As a result, the Kentucky Supreme Court affirmed the convictions and death sentences. *Id.* at 845.

Hodge and Epperson then sought postconviction relief by filing motions under Rule 11.42 of the Kentucky Rules of Criminal Procedure. The trial court denied the motions without a hearing. The two prisoners appealed that denial. *Hodge*, 68 S.W.3d at 391. The Kentucky Supreme Court held that the trial court should have conducted evidentiary hearings, so it remanded the case for such proceedings. *Id.* at 346. The trial court then held the requisite hearings, after which that court again denied the motions for Rule 11.42 relief. *Hodge*, 2011 WL 3805960, at *1.

In 2011, the Kentucky Supreme Court affirmed the trial court's decision denying relief and issued the opinion that is the subject of this appeal. *Id.* at *5. AEDPA directs us to review this opinion, as it is the final reasoned decision of the state court with respect to the claims here. 28 U.S.C. §§ 2253, 2254(a); *see Shinn v. Kayer*, 592 U.S. 111, 120 n.1 (2020) (per curiam) ("*Kayer*"). We address the opinion only as it pertains to Hodge. Epperson is not before us.[1]

Kentucky's highest court held that there was no credible evidence supporting Hodge's claims of jury tampering or misconduct. *Hodge*, 2011 WL 3805960, at *2. As for the ineffective-assistance-of-counsel claim, the court held that although Hodge's trial lawyer deficiently performed at sentencing, there was no prejudicial effect to warrant granting relief under *Strickland*. *Id.* at *3–5; *see Strickland*, 466 U.S. at 700. The court "considered the totality of evidence before Hodge's sentencing jury, including the proposed mitigation evidence," and concluded "that there exists no reasonable probability that the jury would not have sentenced Hodge to death" considering the "heinous nature" of his crimes, and the fact that the "mitigation

---

[1]Following Epperson's state postconviction appeal, the Commonwealth of Kentucky agreed to the reduction of Epperson's death sentence for Tammy Dee Acker's murder to life imprisonment. Epperson remains on death row for his murder conviction in another case. *See Epperson v. Kentucky*, 197 S.W.3d 46 (Ky. 2006).

evidence" included "damaging evidence" about his criminal history. *Hodge*, 2011 WL 3805960, at *4–5. The court noted that "[m]any, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods." *Id.* at *5.

Hodge then petitioned for a writ of certiorari to the Supreme Court of the United States. The Court denied the petition. *Hodge v. Kentucky*, 568 U.S. 1056 (2012). In a solo dissent, Justice Sotomayor took issue with the Kentucky Supreme Court's discussion of Hodge's mitigating evidence as "providing some explanation" behind his criminality, but offering "virtually no rationale for the premeditated, cold-blooded murder." *Id.* at 1059 (Sotomayor, J., dissenting from denial of certiorari). Justice Sotomayor argued the Kentucky court had violated *Strickland* by invoking an improper "'nexus' requirement." *Id.* at 1061. But AEDPA deference did not apply when Justice Sotomayor penned her dissent. That is because Hodge filed the petition for certiorari on collateral review initiated in state court, and § 2254 deference arises only during collateral review in a federal habeas petition. *See id.* at 1058–59; *Hodge*, 2016 WL 4425094, at *10.

Having exhausted the state court system, Hodge then filed his federal habeas petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Kentucky. *Hodge*, 2016 WL 4425094, at *1. Hodge raised 29 claims and moved for summary judgment. In a detailed and thorough opinion, Judge Bunning denied Hodge's motion for summary judgment and his habeas petition. *Id.* at *67. The district court recognized that AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* at *13 (citation omitted).

As relevant to this appeal, the district court denied Hodge's sixth claim alleging ineffective counsel for failure to raise mitigating evidence during the penalty phase. The court concluded that "the record simply does not support [Hodge's] assertions" that "the Kentucky Supreme Court improperly applied *Strickland*'s prejudice prong," considering that the Kentucky court "was careful to acknowledge the severity of the abuse Hodge suffered." *Id.* at *29. Instead, according to Judge Bunning, the state court weighed that information against Hodge's crime being "a brutal and premeditated act on innocent victims" void of remorse. *Id.* Because

Hodge could not demonstrate that the Kentucky Supreme Court was unreasonable in its application of *Strickland*'s prejudice prong, the district court held that § 2254(d)(1) barred relief for this claim. *Id.* at *29–30. Applying AEDPA deference, the district court concluded that the Kentucky Supreme Court's ruling on the ineffective-assistance claim was "not 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at *29 (citation omitted).

Also relevant here, the district court denied Hodge's fifth claim, which alleged jury tampering. Hodge claimed the sequestered jurors were improperly provided newspapers, television, and vodka, and even spoke to the trial prosecutor. *Id.* at *23. Hodge relied on testimony from the bailiff, Gary Rogers. The district court reviewed the state court's postconviction record and its finding that Rogers's testimony was unreliable to the point of Hodge's setting "forth nothing more than 'bald allegations' of jury tampering." *Id.* at *25 (citation omitted). Because the Kentucky court's "factual determinations were not unreasonable in light of the evidence presented," the district court held that AEDPA barred further review. *Id.*

A panel of this court affirmed the district court's denial of habeas relief. *See Hodge*, 12 F.4th at 646. Then a different panel granted Hodge's petition for rehearing. The second panel vacated the first panel's decision, issuing a new opinion and order that reversed the district court and granted the writ on Hodge's ineffective-assistance claim. *See Hodge v. Jordan*, 95 F.4th 393, 403 (6th Cir. 2024). Judge Siler, who wrote for the majority in the first panel decision, dissented from the second panel decision. He emphasized in the first panel decision that, when dealing with a *Strickland* claim, a federal court "must give double deference to the state court's determination" under AEDPA. *Hodge*, 12 F.4th at 643 His opinion for the court held that "the Kentucky Supreme Court's ruling was not contrary to Supreme Court precedent, and 'was not so obviously wrong as to be beyond any possibility for fairminded disagreement.'" *Id.* at 645 (citation omitted).

Now in dissent in the second panel decision, Judge Siler highlighted Hodge's other death penalty case, *Hodge v. Haeberlin*, 579 F.3d 627 (6th Cir. 2009). *See Hodge*, 95 F.4th at 403–04 (Siler, J., dissenting). In *Hodge v. Haeberlin*, a jury convicted Hodge for the robbery and

murders of Edwin and Bessie Morris, an elderly couple. 579 F.3d at 634. Police found those victims' bodies, gagged and bound, on the kitchen and bedroom floors of their home. *See Hodge v. Commonwealth*, 17 S.W.3d 824, 833–34 (Ky. 2000). During the sentencing phase of the *Hodge v. Haeberlin* trial, defense counsel presented 13 mitigation witnesses who testified to Hodge's childhood abuse. *See Hodge*, 95 F.4th at 403–04 (Siler, J., dissenting). In response to that testimony, the prosecution presented Hodge's previous criminal convictions, including his "conviction and death sentence for capital murder, robbery in the first degree, burglary in the first degree," and "also armed robbery, escape, and felonious assault in Tennessee." *Id.* at 404. The jury returned a verdict of death. *Id.* Judge Siler noted that even if defense counsel had presented all of Hodge's mitigation evidence in Hodge's trial for Tammy Dee Acker's murder, the result would have had the same outcome as in *Hodge v. Haeberlin*: the jury would not have spared Hodge from the death penalty. *See id.*

Following the second panel's decision and Judge Siler's dissent, the warden petitioned for rehearing en banc. We granted the petition, thereby vacating the second panel's decision.

## II. DISCUSSION

We review Hodge's habeas petition with a large degree of deference to the Kentucky Supreme Court's postconviction decision. AEDPA requires this deference to respect the finality of judgments and the competence of state courts in our federal system. In our analysis below, we first address the AEDPA standard, then we apply it to our review of Hodge's claims of ineffective assistance of counsel, jury tampering, and jury bias.

### A. The AEDPA Standard

AEDPA authorizes a federal court to grant a writ of habeas corpus for state prisoners only to guard against "extreme malfunctions in the state criminal justice systems." *Shinn v. Ramirez*, 596 U.S. 366, 377 (2022) ("*Ramirez*"). Congress recognized that "[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (citation omitted).

Since the dawn of our nation, states have had primary responsibility over criminal law enforcement. *See Ramirez*, 596 U.S. at 376. "The power to convict and punish criminals lies at the very heart of the states' 'residuary and inviolable sovereignty.'" *Id.* (quoting The Federalist No. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961)). It is an authority that the national government is expected to respect. When federal courts override state court convictions, they "unsettle these expectations" and "inflict a profound injury to the powerful and legitimate interest in punishing the guilty." *Id.* at 376–77 (citation omitted).

Federal intervention also "disturbs" the notion of "concluded litigation" and "undermines the States' investment in their criminal trials." *Id.* at 377 (citation omitted). State trials are not meant to be mere "tryout[s] on the road" to federal habeas relief. *Id.* (citation omitted). That would "detract from the perception" that state court criminal trials are "decisive and portentous" events. *Id.* (citation omitted). The public suffers—particularly surviving victims and loved ones—when we allow previously convicted perpetrators of violent and deadly crimes to relitigate their convictions or sentences, or both, many years after the trial (in this case decades), after evidence has gone stale or been lost, and percipient witnesses (like Dr. Acker) have died. *See Edwards v. Vannoy*, 593 U.S. 255, 263 (2021).

AEDPA helps address these concerns. Congress designed 28 U.S.C. § 2254(d) to remind federal courts that "state courts are the principal forum for asserting constitutional challenges to state convictions." *Richter*, 562 U.S. at 103. Given the powerful state interests at play, federal habeas review is an "extraordinary remedy" that grants federal courts only a "narrow role." *Ramirez*, 596 U.S. at 377 (citation omitted). And even if Hodge prevailed under AEDPA, we cannot grant relief unless "law and justice require" relief. *Brown v. Davenport*, 596 U.S. 118, 134 (2022); 28 U.S.C. § 2243.

Despite this statutory context, Hodge argues his claims clear AEDPA's high hurdles and warrant habeas relief. Under AEDPA, a federal court denies habeas to any "person in custody pursuant to the judgment of a State court" for "any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), unless the claim's state adjudication falls into one of two exceptions, § 2254(d)(1) or (2). The federal court reviews the adjudication from "the final and highest state court to decide the [claims'] merits." *Wilson v. Sellers*, 584 U.S. 122,

127 (2018).  In Hodge's case, that is the Kentucky Supreme Court's 2011 decision.  *Hodge*, 2011 WL 3805960, at *1.

Hodge argues his ineffective-assistance-of-counsel claim satisfies § 2254(d)(1).  That subsection allows habeas relief when the claim's state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).  As for his jury-tampering claim, Hodge argues that it satisfies § 2254(d)(2), which allows relief when the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2).  He also maintains entitlement to relief on his jury bias claim because the state court did not evaluate the claim on the merits.

**B.**     **Ineffective-Assistance-of-Counsel Claim**

For his ineffective-assistance claim, Hodge argues that Kentucky's highest court misinterpreted and misapplied *Strickland v. Washington*, which functions as the operative "clearly established Federal law" in this area.  *Richter*, 562 U.S. at 101; 466 U.S. at 687.  We address *Strickland*'s prejudice requirement as well as AEDPA deference in this context below.  Then we apply that governing law to review the Kentucky Supreme Court's decision.

### 1.  *Strickland*'s Prejudice Requirement

Defendants can win an ineffective-assistance-of-counsel claim by showing their counsel (1) provided "deficient" performance that (2) "prejudiced the defense."  *Strickland*, 466 U.S. at 687.  Here, the deficient performance of Hodge's counsel is not contested, so we focus on whether Hodge satisfied the prejudice prong.  In the capital sentencing context, the prejudice inquiry requires courts to ask whether there is a "reasonable probability" that, absent the attorney's errors, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id.* at 695.  "Sentencer" includes an "appellate court, to the extent it independently reweighs the evidence."  *Id.*  And by "reasonable probability," the Court means "a probability sufficient to undermine confidence in the outcome," which requires a "substantial, not just conceivable, likelihood of a different result."  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation omitted).  To determine whether a prisoner

satisfies this standard, "a court must consider the totality of the evidence before the judge or jury" by evaluating "the strength of all the evidence" and comparing "the weight of aggravating and mitigating factors." *Thornell v. Jones*, 602 U.S. 154, 164, 171–72 (2024).

Consider *Strickland* itself. There, the Florida Supreme Court affirmed that counsel did not prejudice the defendant, Washington, by failing to develop and present mitigating evidence about his character and emotional state. *See Strickland*, 466 U.S. at 673, 677–78. At sentencing, Washington's counsel relied only on a plea colloquy for evidence of the defendant's background and emotional distress, thus preventing the State from cross-examining Washington and presenting its own psychiatric evidence. *Id.* at 673.

The Florida Supreme Court affirmed the trial court's conclusion that "no substantial prejudice resulted" from the absent mitigating evidence because "there is not even the remotest chance that the outcome would have been any different," considering the "plain fact" that "the aggravating circumstances proved" in Washington's case were "completely overwhelming." *Id.* at 677–78. The district court upheld that state court determination on habeas review. *Id.* at 678–79. But the then-Fifth Circuit reversed, applying a since-overturned prejudice test, which required the defendant to show only that counsel's errors "resulted in actual and substantial disadvantage to the course of his defense." *Id.* at 682.

The U.S. Supreme Court reversed the Fifth Circuit and, in so doing, established the two-part *Strickland* test. That test requires defendants bringing ineffective-assistance claims to show their counsel (1) provided "deficient" performance that (2) "prejudiced the[ir] defense." *Id.* at 687. The Supreme Court held that counsel neither provided deficient representation nor prejudiced the defense. *Id.* at 699–700. The Court emphasized that the purpose of the effective assistance constitutional requirement is "to ensure a fair trial." *Id.* at 686. And particularly relevant here, the Court rooted the standard for judging prejudice in *materiality*—like materiality tests for undisclosed exculpatory information or unavailable testimony at trial. *See id.* at 694. That test requires more than simply showing that the counsel's errors "had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

The Supreme Court assessed the mitigating evidence that Washington wished his counsel had offered at his sentencing. The Court explained that Washington's evidence showed, "at most," that people who knew Washington "thought he was generally a good person" and that a psychiatrist and a psychologist "believed he was under considerable emotional stress that did not rise to the level of extreme emotional disturbance." *Id.* at 700. The Court decided that the evidence accordingly "would barely have altered the sentencing profile presented to the sentencing judge," so there was "no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances." *Id.* at 700. In other words, the mitigating evidence was not strong enough to affect the sentencing decision. Indeed, that evidence might even have been "harmful to his case: his 'rap sheet' would probably have been admitted into evidence," which would have contradicted Washington's prior statements to the trial judge that he had no significant criminal history, *id.* at 673, and Washington's proposed "psychological reports would have directly contradicted [his] claim that the mitigating circumstance of extreme emotional disturbance applied to his case." *Id.* at 700.

To show prejudice in his ineffective-assistance claim, *Strickland* thus establishes that Hodge must do more than point to unpresented mitigating evidence. The missing proof must have been significant enough to show a reasonable probability that at least one juror, had he or she known of that evidence, would not have imposed the death penalty. *See id.* at 694.

### 2.  AEDPA Deference Applying *Strickland*

We now review the Kentucky Supreme Court's interpretation and application of *Strickland*'s prejudice prong. But we do not review that decision de novo. Rather, our task under AEDPA is to decide whether the Kentucky Supreme Court's decision—concluding that unpresented evidence of Hodge's childhood was not material under the *Strickland* test—"was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see, e.g.*, *Kayer*, 592 U.S. at 124; *Richter*, 562 U.S. at 113. The Supreme Court has said that the "contrary to" and "unreasonable application" clauses must be given "independent meaning." *Williams v. Taylor*, 529 U.S. 362, 364 (2000). The "contrary to" clause is relevant when a state court

applies a rule that "contradicts the governing law." *Id.* at 405. The "unreasonable application" clause, meanwhile, governs scenarios where the state court identified the correct legal rule but applied that rule unreasonably. *Miles v. Jordan*, 988 F.3d 916, 924 (6th Cir. 2021). That distinction informs our analysis in Hodge's case.

For an adjudicated state court decision to "unreasonabl[y] appl[y]," § 2254(d)(1), clearly established federal law (here, *Strickland*), the state court's determination must be "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement,'" *Kayer*, 592 U.S. at 124 (citation omitted). That is a high bar and "the only question that matters." *Richter*, 562 U.S. at 102. A prisoner must show "far more than that the state court's decision was 'merely wrong' or 'even clear error.'" *Kayer*, 592 U.S. at 118 (quoting *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (per curiam)). It must be so "lacking in justification" to be "objectively unreasonable." *LeBlanc*, 582 U.S. at 94. Otherwise, AEDPA proscribes that "federal courts must follow" the state court's decision. *Brown*, 596 U.S. at 127.

Under § 2254(d), therefore, we give the state court "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S 19, 24 (2002) (per curiam); *see Richter*, 562 U.S. at 102. We do not conduct a de novo review and substitute our "own judgment for that of the state court" to find a *Strickland* violation. *Kayer*, 592 U.S. at 121 (citation omitted). AEDPA demands we ask only "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with a prior" Supreme Court holding. *Richter*, 562 U.S. at 102. Because *Strickland*'s general standard has a substantial range of reasonable applications, "a state court has even more latitude" under AEDPA "to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). This means that habeas petitioners wishing to show unreasonable application under § 2254(d)(1) face a difficult task in federal court: proving "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

Meanwhile, a state court decision is "contrary to," § 2254(d)(1), clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in the Supreme Court's cases, *Williams*, 529 U.S. at 405. We have explained that a state court decision is contrary to clearly established law only if it "(1) applies a rule that directly conflicts with a

rule prescribed by the Supreme Court or (2) confronts a case with materially identical facts to a Supreme Court decision and decides the case differently." *Rogers v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (en banc). In assessing whether a state court decision was contrary to federal law, a federal habeas court must be careful not to "mischaracteriz[e]" a state-court opinion that "expressed and applied the proper standard for evaluating prejudice." *Visciotti*, 537 U.S. at 22. Nor may federal courts use § 2254(d)(1) to "flyspeck state-court opinions" and "impose mandatory opinion-writing standards on state courts." *Rogers*, 69 F.4th at 391–92. Instead, we must analyze the "*decision* as a whole—not a few words or a stray thought." *Id.* at 392 (citation omitted).

*Shinn v. Kayer* provides one example of how federal courts apply AEDPA to review whether a state court's *Strickland* prejudice decision was an unreasonable application of federal law. 592 U.S. at 112. In that case, the defendant (Kayer), his girlfriend, and a travel-companion-turned-murder-victim (Haas) journeyed back from a gambling trip in Nevada. *Id.* at 113. Kayer had borrowed money from Haas but lost it gambling. So the defendant hatched a plan to get out of his debt: he told his girlfriend that he would "just have to kill" Haas on the car ride back. *Id.* Kayer pulled over to a secluded area, grabbed a gun when Haas exited the car to urinate, snuck up on him, and shot him pointblank in the head. *See id.* He stole Haas's wallet, watch, and jewelry, and drove away. Realizing he did not grab Haas's house keys, Kayer turned around, shot Haas in the head again, and drove to Haas's home. *See id.* There, he stole firearms and other valuables that he and his girlfriend later sold under various aliases. *See id.*

At sentencing, Kayer's attorneys failed to present evidence of Kayer's mental illness, alcohol and gambling addictions, and troubled childhood. All they said was that Kayer was important in his son's life. *See id.* at 114. When Kayer moved for postconviction relief in the Arizona Superior Court, that court denied the motion, holding in a conclusory manner that "no prejudice to the defendant can be found." *Id.* at 115. The Arizona Supreme Court affirmed. Kayer then unsuccessfully filed a habeas petition in federal district court. That court decided that he could not show prejudice because the mitigation evidence "fell short of the type of mitigation information that would have influenced the sentencing decision." *Id.* at 116. But the Ninth Circuit reversed, concluding there was "a reasonable probability that the Arizona Supreme Court

would have vacated Kayer's death sentence on direct review had it been presented with the mitigating evidence offered at the state postconviction relief hearing." *Id.*

The U.S. Supreme Court decided that the Ninth Circuit erred in second-guessing the Arizona Supreme Court and imposing rigid writing requirements on that court. To start, the Court explained that the state court employed "the correct governing legal principle" of *Strickland* to Kayer's case, so the state court's decision was not contrary to federal law. *Id.* at 118 (citation omitted). The Supreme Court accordingly focused on whether the state decision involved an unreasonable application of Supreme Court precedent. *See id.*

So, the Court considered and weighed the evidence. On one hand, Kayer's bipolar disorder and untreated addictions could impair his ability to appreciate his conduct's wrongfulness and prevent him from conforming his conduct to the law. *See id.* at 122. But on the other hand, Kayer had many opportunities to reconsider his actions. He planned the murder in advance, drove his victim to a remote area, and later returned to the murder scene to shoot the victim in the head yet again and hide his body. *Id.* Not to mention, Kayer intended to and did profit from the crime. Ultimately, the Court concluded that the unpresented mitigation evidence "did not create a substantial likelihood of a different sentencing outcome." *Id.* at 121. It was not strong enough proof to be material under the doubled deference of *Strickland* and AEDPA. Applying AEDPA, the Court noted that the Arizona state court decision was not beyond any possibility for fairminded jurists to disagree. *Id.* at 124. Because that is "the only question that matters," the Court affirmed the district court's denial of habeas relief and vacated the Ninth Circuit's contrary ruling. *Id.* (quoting *Richter*, 562 U.S. at 102).

### 3. Application of *Strickland, Kayer,* and AEDPA to Hodge's Claim

Both *Strickland* and *Kayer* offer parallels to Hodge's case. In denying habeas relief to Hodge, the Kentucky Supreme Court articulated the correct legal standard and reasonably applied *Strickland*. And the state court opinion provided adequate reasoning. Hodge has not advanced any argument to the contrary and cannot overcome AEDPA deference to the Kentucky Supreme Court's ruling on the prejudice requirement.

The Kentucky Supreme Court correctly identified and applied *Strickland*'s prejudice prong. *See Hodge*, 2011 WL 3805960, at \*3. As required by that standard, the Kentucky court analyzed whether Hodge showed there was a reasonable probability that "the result of the penalty phase would have been any different had this mitigation evidence been presented to the sentencing jury." *Id.* at \*4. This quasi-materiality test is just what *Strickland* prescribes for the prejudice inquiry.

The Kentucky Supreme Court examined all of Hodge's proposed mitigating evidence. *See id.* at \*2–5. It recognized that the "trial court's characterization of Hodge's childhood as 'difficult'" was "certainly inadequate" given the "extreme violence [Hodge] suffered at the hands of his stepfather." *Id.* at \*3. And it noted the trial court's "description of Billy Joe as 'particularly abusive'" to be "insufficient." *Id.* Kentucky's highest court analyzed the mitigating evidence and testimony from Hodge's mother, sisters, and two psychologists. *Id.* at \*3–4. But it recognized that Hodge's supposed extenuating proof "also included the damaging evidence of his long and increasingly violent criminal history, his numerous escapes from custody, and the obvious failure of several rehabilitative efforts." *Id.* at \*4. That reflects the careful examination of the defendant's proposed mitigating evidence that *Strickland* requires. *See* 466 U.S. at 700.

Then the Kentucky Supreme Court weighed the mitigating evidence against the aggravating "heinous nature of Hodge's crime." *Hodge*, 2011 WL 3805960, at \*4. Hodge's conviction rested largely on direct evidence. A victim (Dr. Acker), an accomplice (Bartley), arresting officers, and a cellmate all testified to the facts against Hodge in damning fashion. Hodge assaulted an elderly widowed doctor and murdered that doctor's daughter. His crimes "were not just brutal and vicious, but calculated and exceedingly cold-hearted." *Id.* Hodge and his accomplices "carefully planned the robbery after learning of the large quantity of cash kept in the home safe." *Id.* They traveled to commit their crimes, carrying supplies and firearms with them. *Id.* They impersonated federal agents to access the home. *Id.* And they waited hours after their first attempt to access the home failed. In their second attempt, Hodge held Dr. Acker at gunpoint, ordered him and his daughter Tammy bound and gagged, and stole nearly $2 million and other valuables from their home. Hodge then played a key role in eliminating the witnesses to his illegal acts. He stabbed Tammy, a defenseless young woman, at least 10 times so

viciously that the knife went through her body to the floor. This was no fit of unpremeditated rage. And no one could mistake from the evidence that Hodge himself committed the charged offenses, including Tammy's murder. The proof also revealed that Hodge had no regrets: he enjoyed the fruits of his crimes.

The appellate reviewing court thus independently reweighed all the evidence, including the mitigating evidence that Hodge wished that his trial counsel provided initially. *See Strickland*, 466 U.S. at 695. "Balancing all of the available evidence in mitigation and aggravation," as it must under *Strickland*, the Kentucky Supreme Court concluded that there "exists no reasonable probability that the jury would not have sentenced Hodge to death." *Hodge*, 2011 WL 3805960, at *5; 466 U.S. at 695. Simply put, the court determined the unpresented mitigating evidence was not enough to overcome the aggravating facts of Hodge's odious conduct.

Like the defendant in *Kayer*, Hodge committed a brazen act of violence. Like Kayer, Hodge showed premeditation and was motivated by pecuniary gain. Like Kayer, Hodge had plenty of opportunities to reconsider his actions. And, as in Kayer's case, the repulsive circumstances of the murder and its aftermath could have been reasonably viewed by the state court to create no reasonable probability that Hodge's jury would have rejected the death penalty—no matter the mitigating evidence he could have presented.

The dissent seeks to distinguish *Kayer* by noting that Kayer "did not experience severe child abuse like Hodge did." *Dissent* at 45. And it argues that *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) "suggest that the Supreme Court views severe abuse as distinct from other types of childhood difficulties in its ability to mitigate a defendant's crimes." *Dissent* at 46. Whether true or not, that does not change the analysis that we apply under AEDPA now. Regardless of the significance of Hodge's childhood abuse, controlling Supreme Court precedent does not render it unreasonable for the Kentucky Supreme Court to find no prejudice here, given its view that the aggravating factors overwhelmingly pointed to imposing the death penalty.

Even if some of us on this court would have reached a different conclusion in the first instance on the issue of prejudice, the Kentucky Supreme Court acted within the bounds of reasonableness under AEDPA deference. The court weighed Hodge's missing mitigating evidence against aggravating evidence of Hodge's "particularly depraved and brutal" crimes to conclude that the sentencing jury would not have spared Hodge the death penalty. *Hodge*, 2011 WL 3805960, at *5. Under AEDPA, that conclusion was not so objectively wrong under U.S. Supreme Court precedent to be beyond any possibility for fairminded jurists to disagree.

### 4. Analysis of Hodge's Arguments

The caselaw Hodge and the dissent rely upon does not dissuade us. Unlike those cases, the aggravating factors here can reasonably be viewed as dispositive for his death sentence. Hodge had a violent criminal history and premeditatively planned a brutal murder for pecuniary gain. And he showed no remorse: he enjoyed the stolen money and boasted about his crimes after the fact. This case is therefore not like *Porter v. McCollum*, where the Supreme Court found weak aggravating factors from a "crime of passion" deemed not to be "especially heinous." 558 U.S. 30, 42 (2009) (per curiam). Nor is it like *Wiggins*. There, the Court decided that counsel's performance had prejudiced a defendant who had no aggravating factors or history of violence. 539 U.S. at 525, 537.

The mitigation evidence in the cited cases differs in kind and scope from Hodge's too. *Williams v. Taylor* involved a defendant who turned himself in, cooperated with police, expressed remorse, and had a mental disability. 529 U.S. at 398. In *Rompilla*, the jury never heard of the defendant's learning disability which barred him from appreciating his conduct's criminality. 545 U.S. at 392. As for *Porter*, the unintroduced mitigation evidence went far beyond childhood abuse to include Porter's "heroic" military record in the Korean War (during which he was wounded multiple times), trauma he suffered from his military service, long-term substance abuse issues, and his "impaired mental health and mental capacity." 558 U.S. at 33. The opinion's opening line reveals how relevant the Court considered that war record to Porter's sentence. *Id.* at 30 ("George Porter is a veteran who was both wounded and decorated for his active participation in two major engagements during the Korean War; his combat service unfortunately left him a traumatized, changed man.").

The quality and extent of the unpresented mitigating evidence, when weighed against the aggravating circumstances, resulted in a stronger showing of prejudice in these cases than there was here. Their inapposite circumstances thus "offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking," *Pinholster*, 563 U.S. at 202, with respect to Hodge's sentencing.

Lacking any case directly on point to support his argument, Hodge advances another argument: that the Kentucky Supreme Court applied an improper "nexus requirement" test in *Strickland*'s stead. That contention rests on a mischaracterization of the state court opinion, which *Visciotti* forbids. *See* 537 U.S. at 22. In *Visciotti*, the U.S. Supreme Court chided the Ninth Circuit for mischaracterizing how the California Supreme Court conducted its *Strickland* analysis. *See id.* at 24. Despite the California court's efforts to "painstakingly describe[] the *Strickland* standard," it made an "occasional shorthand reference to that standard by use of the term 'probable,'" not preceded by the modifier, "reasonably." *Id.* at 23–24. The Ninth Circuit seized on that "probable" language found only in one paragraph of the California opinion to discount the state court's more detailed *Strickland* analysis. *See id.* at 24. The Supreme Court took issue with the Ninth Circuit's making "no effort to reconcile the state court's use of the term 'probable,' with its use, elsewhere of *Strickland*'s term[s]"—not to mention the Ninth Circuit's failure to "even acknowledge, much less discuss, the California Supreme Court's proper framing of the question as whether the evidence 'undermines confidence' in the outcome of the sentencing proceeding." *Id.* at 24.

Like the Ninth Circuit's giving short shrift to the California Supreme Court in *Visciotti*, Hodge's argument discounts paragraphs of the Kentucky Supreme Court's analysis, focusing instead on a single sentence. The dissent does the same. But this characterization unfairly discredits 12 paragraphs of the Kentucky court's reasoning—like when that court "turn[ed] to the primary inquiry before [it], i.e., whether" there was a reasonable probability that "the result of the penalty phase would have been any different had [] mitigation evidence been presented to the sentencing jury." *Hodge*, 2011 WL 3805960, at *4. Hodge's argument also ignores that the state court detailed the childhood abuse Hodge faced, his tragic introduction to the criminal justice system as an adolescent, and his PTSD that resulted from these hardships. *Id.* at *3–4.

And it acknowledged that Hodge "was described by all as a loving father" and someone who "did not inflict any abuse on his own children." *Id.* But the court concluded that these mitigating factors did not outweigh the aggravating factors, which included "damaging evidence of his long and increasingly violent criminal history," and the "carefully planned" nature of Hodge's crime of traveling "out of state to carry out" stealing millions, stabbing Tammy Acker at least 10 times ("all the way through her to the floor"), and celebrating by purchasing lavish items and "having sex with his girlfriend on top" of the stolen money. *Id.* at \*4–5.

The Kentucky Supreme Court did not apply an improper nexus requirement. The paragraph now under scrutiny simply puts a period on the Kentucky court's earlier analysis. When it concluded that Hodge's childhood does not explain his calculated crime, the Kentucky Supreme Court was assessing the strength of the proposed mitigating evidence. The court reasoned that, considering the substantial aggravating factors present in his case, Hodge's mitigating evidence was not sufficiently persuasive because it lacked a direct causal connection to his crime. It is not the case that if it can be shown "that trial counsel failed to produce any mitigating evidence that can be characterized as 'substantial,' [Hodge] must be resentenced." *Thornell*, 602 U.S. at 165. *Thornell* is clear: "where the aggravating factors greatly outweigh the mitigating evidence, there may be no 'reasonable probability' of a different result." *Id.* Such an "argument is squarely inconsistent with *Strickland*." *Id.*

The Kentucky Supreme Court concluded that the aggravating factors greatly outweigh the mitigating evidence here. It reasonably determined that Hodge's mitigation evidence "offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge." *Hodge*, 2011 WL 3805960, at \*5. In making this determination, the Kentucky Supreme Court necessarily assessed whether the evidence of Hodge's childhood was material enough to reasonably sway a juror to save Hodge. It "never said it would ignore any evidence that wasn't tied to the murders; it simply discounted the weight of that evidence because it lacked a connection with the murders." *White v. Plappert*, --- F.4th ---, 2025 WL 815203, at \*11 (6th Cir. Mar. 14, 2025). It thus adhered to "a correct statement of ineffective-assistance law," that "'where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged

failure to present mitigating evidence.'" *Id.* at *10 (citation omitted). The court was entitled to decide that Hodge's evidence failed to meet the *Strickland* prejudice prong on this basis. *See Thornell*, 602 U.S. at 164–65 (explaining that a state court may "find mitigating evidence unpersuasive" on the grounds that it lacks a causal connection to a defendant's crime).

The fairest reading of the Kentucky opinion is that the court carefully examined Hodge's evidence and then—as required—assessed whether there was a reasonable probability that a sentencing juror could "have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Hodge*, 2011 WL 3805960, at *3 (citation omitted). As that is a correct application of *Strickland*, we defer to the Kentucky Supreme Court's determination that Hodge suffered no prejudice.

## C.      Jury-Tampering Claim

Hodge argues that his jury-tampering claim satisfies 28 U.S.C. § 2254(d)(2). When a state court has already decided the issue on the merits, this AEDPA subsection allows federal courts to issue a habeas writ only where the state court decision was "based on an unreasonable determination of the facts" presented in state court. § 2254(d)(2). In other words, state court factual findings are presumed correct and federal courts may displace them only when the findings are shown to be "objectively unreasonable by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

Hodge fails to meet this high standard. The Kentucky Supreme Court decided that Gary Rogers—Hodge's star witness and the bailiff of his trial—gave unreliable testimony. At a postconviction evidentiary hearing, Rogers testified to prosecutors allegedly speaking with jurors who supposedly had improper access to television, newspapers, and alcohol. But there were omissions and inconsistencies in Rogers's testimony. When he was not pleading the Fifth Amendment to almost every question, Rogers forgot whether the prosecutor had brought any improper items to jurors, and contradicted his own testimony by saying that the jurors did not have access to newspapers, televisions, or the prosecutor. Rogers even denied making a prior signed statement and accused attorneys of forging his signature. He also hinted that he had received a prior conviction that related to Hodge's case. In fact, Rogers was a convicted felon,

but his conviction had nothing to do with Hodge's case. And Rogers's corroborating witness was a since-disbarred judge who was not at Hodge's trial. So, the Kentucky Supreme Court instead credited another witness—a juror who denied any misconduct.

The Kentucky Supreme Court found "no credible evidence presented to support a conclusion that any jury tampering or misconduct occurred." *Hodge*, 2011 WL 3805960, at *2. Applying AEDPA, we see no clear and convincing evidence signifying that the state court made any objectively unreasonable legal ruling under any precedent of the U.S. Supreme Court or any objectively unreasonable finding of fact. So, we do not disturb the Kentucky Supreme Court's rejection of the jury-tampering claim.

## D.     Jury-Bias Claim

Finally, Hodge argues that we should consider his claim for jury bias because AEDPA does not apply where the state court did not evaluate the claim on the merits. True, the state court did not consider the claim. But that is because Hodge never raised the issue for adjudication. The claim, therefore, is procedurally defaulted because Hodge failed to exhaust his remedies in state court. *See* 28 U.S.C. § 2254(b)(1), (c). And because Hodge cannot show cause or prejudice excusing his default, his claim must be rejected. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

In the state court proceedings, Hodge argued that "counsel was ineffective during the crucial jury selection process." Dkt. 107 at 7075. He further asserted that his attorney had failed to learn about the relationship between the jury foreman and the prosecutor. But now, he takes a different approach. Hodge argues that his jury was biased in several novel ways, including improper relationships with the victim, trial judge, law enforcement, and the prosecutor. But because Hodge did not raise his jury bias claims in state court, Kentucky state procedural rules now bar consideration of his claim. *See Hodge*, 12 F.4th at 645–46 (Siler, J.); *Hodge*, 95 F.4th at 403 (White, J.). And he demonstrates no cause or prejudice to absolve his default. Accordingly, Hodge's jury bias claim fails.

**III. Conclusion**

We are not deciding the issues in this case on direct appeal. Instead, we review the Kentucky Supreme Court's decision through the lens of AEDPA and respect the boundaries of our authority under the statute. That means stepping in only when a state court unreasonably interprets or applies U.S. Supreme Court precedent, or unreasonably determines facts. The Kentucky Supreme Court did neither of those things here. We therefore **AFFIRM** the district court's judgment denying the habeas petition.

———————————

## CONCURRENCE

———————————

NALBANDIAN, Circuit Judge, concurring. I join the majority opinion in full. I write separately to expound on the key issue in the case—whether the Kentucky Supreme Court committed a legal error when it evaluated what would have been Hodge's mitigation evidence. As originally explained by Justice Sotomayor, the state court's supposed mistake was requiring that the proposed mitigation evidence "explain[]" or provide some "rationale" for Hodge's crimes—this is the "nexus" argument. *Hodge v. Kentucky*, 133 S. Ct. 506, 509 (2012) (Sotomayor, J., dissenting from denial of certiorari) (internal quotation marks omitted). And this was the theory that the panel majority accepted in its opinion. The en banc majority rejects this argument. I agree. There was nothing wrong with the Kentucky Supreme Court's reasoning. I write separately to emphasize that the state court did not err when it considered Hodge's crime alongside the mitigation evidence. This review was crucial to the court's assessment of how a reasonable jury could view Hodge's overall moral culpability.

The alleged nexus requirement comes from this language in the Kentucky Supreme Court's opinion:

> Perhaps this information may have offered insight for the jury, providing some explanation for the career criminal he later became. If it had been admitted, the PTSD diagnosis offered in mitigation might have explained Hodge's substance abuse, or perhaps even a crime committed in a fit of rage as a compulsive reaction. *But it offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge.* Many, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods. Even if the sentencing jury had this mitigation evidence before it, we do not believe, in light of the particularly depraved and brutal nature of these crimes, that it would have spared Hodge the death penalty.

*Id.* at 508 (quoting *Hodge v. Commonwealth*, No. 2009-SC-000791-MR, 2011 WL 3805960, at *5 (Ky. Aug. 25, 2011)) (emphasis added). Like Justice Sotomayor, Hodge reads this statement as dismissing his mitigation evidence because it did not explain, excuse, or offer a rationale for

the murder. He claims that this runs afoul of Supreme Court precedent because mitigation evidence cannot be limited to any specific purpose—"*any* aspect of a defendant's character or record" may be offered as a mitigating factor. *Id*. at 509 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis added)).

But Hodge mischaracterizes the state court's holding. The Kentucky Supreme Court did not improperly limit Hodge's mitigation evidence to the extent that it rationalized his crime. Instead, the court weighed the mitigating and aggravating factors together and considered the reality that if evidence provides no rationale for the crime, it is less weighty. I write to highlight that the Supreme Court's opinion in *Williams v. Taylor*, 529 U.S. 362 (2000), made this exact inquiry not only proper but necessary. Moreover, there is no indication that the Kentucky Supreme Court otherwise limited its consideration of the possible impact of the proposed mitigating evidence.

In *Williams*, the Supreme Court asked if counsel's failure to discover and present evidence of a capital defendant's severe childhood abuse, mental retardation, and efforts to aid law enforcement prejudiced the defendant under *Strickland*. *Id.* at 396–97. The Court held it did. *Id*. at 396. To decide if a jury would have sentenced Williams to death if it had the proposed mitigation evidence, the Court focused on his "moral culpability"—and that is necessarily linked to the crime at issue. *Id*. at 398. The Court made that clear: "The circumstances [of William's] several confessions are consistent with the view that *in each case his violent behavior was a compulsive reaction* rather than the product of cold-blooded premeditation." *Id*. (emphasis added). Only then did the Court conclude that the mitigating evidence might have undermined Williams' moral culpability, potentially causing a reasonable jury to not recommend a death sentence. *Id*.

In assessing how a jury would view a defendant's moral culpability, the Supreme Court has openly explained that courts can consider how the underlying crime relates to mitigation evidence. *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[J]ustice requires that there be taken into account *the circumstances of the offense* together with the character and propensities of the offender." (cleaned up) (emphasis added)). One might read this as a nexus requirement. But even if the Court hasn't required a nexus, it has allowed courts to balance an

offense against the offender's character and personal history.  It has long been true that "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Franklin v. Lynaugh*, 487 U.S. 164, 184 (1988) (O'Connor, J., concurring) (quoting *California v. Brown*, 479 U.S. 538 (1987) (O'Connor, J., concurring)) (summarizing the holdings of *Lockett*, 438 U.S. 586, *Eddings*, 455 U.S. 104, and *Hitchcock v. Dugger*, 481 U.S. 393 (1987)).  Most recently, the Court affirmed a lower court that "declined to give [mitigating evidence of mental illness] much weight because [the defendant] did not 'establish a causal connection between his alleged mental illness and his conduct on the night of the murders.'" *Thornell v. Jones*, 602 U.S. 154, 166 (2024) (quoting *State v. Jones*, 917 P.2d 200, 221 (Ariz. 1996)).  The Court then found that other mitigation evidence suffered from the same flaw: "it [was] not causally connected to the murders." *Id.* at 169.

Ultimately, this is part of the *Strickland* prejudice inquiry's requirement that courts analyze "the strength of all the evidence and a comparison of the weight of aggravating and mitigating factors." *Id.* at 171–72.  The circumstances of the crime are an aggravating factor to be compared against the proposed mitigating factors.  *See Tuilaepa v. California*, 512 U.S. 967, 976 (1994).  Together, this evidence paints the full picture of the defendant's moral culpability. *See Franklin*, 487 U.S. at 184 (O'Connor, J., concurring).

That is exactly what the Kentucky Supreme Court did here.  It "considered the totality of evidence before Hodge's sentencing jury, including the proposed mitigation evidence" and "[b]alancing all of the available evidence in mitigation and aggravation" found "no reasonable probability that the jury would not have sentenced Hodge to death." *Hodge*, 2011 WL 3805960, at *5.  Because "[t]his analysis requires . . . a comparison of the weight of the aggravating and mitigating factors," *Thornell*, 602 U.S. at 171–72, the court found that a jury may have been swayed by the mitigation evidence in a lesser crime,  *Hodge*, 2011 WL 3805960, at *5.  But it concluded that for *this crime*—a premeditated, cold-blooded murder and attempted murder of two innocent victims—the mitigation evidence would not have swayed a reasonable jury. *Id.*

If the Kentucky Supreme Court had *not* considered how the proposed mitigation evidence compared to the circumstances of the crime, Hodge would have likely challenged the decision

for not conducting a fulsome inquiry under *Williams*. He could have argued the proposed mitigation evidence showed that "his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation." *Williams*, 529 U.S. at 398. The Kentucky Supreme Court simply preempted this argument and made clear that the proposed mitigation evidence provided "no rationale" for Hodge's crimes. *Hodge*, 2011 WL 3805960, at *5. This was not error.

For this reason, I concur.

———————————

**CONCURRENCE**

———————————

BLOOMEKATZ, Circuit Judge, concurring. The facts in this case are extreme. As the dissent explains, and is further detailed in the record, the evidence demonstrates that Hodge had one of the most traumatic and harrowing childhoods I would think one could find described in the pages of the federal reporters. His crime was also horrifying, as the majority recounts. Despite the severe aggravating factors surrounding Hodge's crime, I believe there is nonetheless at least a "reasonable probability" that a jury, confronted with the sobering evidence that Hodge's childhood involved a "most severe and unimaginable level of physical and mental abuse," would have decided that Hodge deserved to be spared the death penalty. *Hodge v. Commonwealth*, No. 2009-SC-000791-MR, 2011 WL 3805960, at *3, *5 (Ky. Aug. 25, 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 694–95 (1984)). If I were a Kentucky state court judge confronting this case on direct review, I would hold that Hodge was prejudiced by his counsel's failure to introduce the substantial mitigation evidence to which Hodge now points.

But that is not our role at this stage. On federal habeas review, we are constrained by AEDPA. *See Brown v. Payton*, 544 U.S. 133, 148 (2005) (Breyer, J., concurring) ("In my view, this is a case in which Congress' instruction to defer to the reasonable conclusions of state-court judges makes a critical difference."). Applying AEDPA's deferential standard, I agree with the majority that the Kentucky Supreme Court's decision here was neither contrary to nor an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). As I read the state court's decision, the court grappled with the extreme nature of both the mitigating and aggravating circumstances and concluded that, on balance, there was not a reasonable probability that a jury would have changed its mind at the penalty phase of Hodge's trial. Focusing on two sentences in the opinion, the dissent reads the state court as imposing an improper nexus requirement—that is, dismissing Hodge's evidence to the extent it did not directly explain why he committed this particular crime. While the dissent presents a plausible reading, the state court's decision need not be read as discounting entirely the import of the

mitigation evidence Hodge's defense counsel failed to present. And given the deferential review required in this posture, I do not read the state court's decision so narrowly.

Nor do I read the majority opinion as creating categorical rules regarding the weight or import of types of mitigation evidence. Certainly, as the majority states, courts may consider whether mitigation evidence has a direct tie to a defendant's crime as one factor in their analysis. *See Thornell v. Jones*, 602 U.S. 154, 164–65 (2024). But the majority rightly does not reject the proposition that mitigation evidence that lacks a direct relation to a defendant's crime—here, evidence of devastating childhood trauma—can nevertheless be critical to a jury's penalty-phase decision. *See* Majority Op. at 22–24. "Mitigation evidence need not, and rarely could, 'explai[n]' a heinous crime; rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be executed, or to be shown mercy instead." *Hodge v. Kentucky*, 568 U.S. 1056, 1056 (2012) (Sotomayor, J., dissenting from denial of certiorari) (alteration in original). Evidence of a traumatic childhood could also play a role in explaining a defendant's criminal conduct, even if the defendant's crimes were not directed at the subjects of their abuse or otherwise obviously related to their past traumatic experiences. *See United States v. Rivera*, 192 F.3d 81, 85 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood—at some level of severity—can impair a person's mental and emotional conditions."); Deborah W. Denno, *How Courts in Criminal Cases Respond to Childhood Trauma*, 103 Marq. L. Rev. 301, 310 (2019) ("The vast array of research on childhood trauma . . . indicates links, either direct or indirect, between the effects of such trauma and long-term psychiatric and behavioral difficulties, including criminality."). The brain is not so simple, and that complexity cautions against categorically discounting the mitigating value of evidence like we have here, of Hodge's childhood abuse. The majority's resolution of Hodge's *Strickland* claim comports with that understanding.

I accordingly join the majority opinion. But my agreement with the majority that the Kentucky Supreme Court's decision does not meet the high threshold required to warrant federal intervention under AEDPA is in no way an endorsement of the state court's decision. In future cases, state courts reviewing *Strickland* claims in this context must still take seriously the possibility that mitigation evidence could have swayed a jury not to vote for death, even in the

face of a heinous murder, and even when that mitigation evidence does not directly explain away a defendant's crime.

———————————————

**CONCURRENCE/DISSENT**

———————————————

Helene N. White, Circuit Judge, concurring in part and dissenting in part. I join in the majority's discussion and rejection of the jury-tampering claim. I respectfully dissent, however, from the majority's conclusion that the Kentucky Supreme Court reasonably applied *Strickland v. Washington* in rejecting Hodge's ineffective-assistance-of-counsel claim on the basis that he failed to show prejudice. 466 U.S. 668 (1984). Accordingly, I would reverse the district court's denial of habeas relief.

**I.**

At the sentencing phase of Hodge's trial, defense counsel presented no mitigation case and said only: "Benny Lee Hodge has a loving and supportive family-a wife and three children. He has a public job work record and he lives and resides permanently in Tennessee." *Hodge v. Commonwealth*, No. 2009-SC-000791-MR, 2011 WL 3805960, at *2 (Ky. Aug. 25, 2011). Counsel's perfunctory stipulation omitted considerable mitigation evidence, as shown by the Kentucky Supreme Court's description of the evidence presented at his postconviction hearing:

> [W]e turn to a review of the mitigation evidence that was available at the time of Hodge's trial. His mitigation case would have been based on his childhood, which was marked by extreme poverty, sustained physical violence, and constant emotional abuse. The trial court's characterization of Hodge's childhood as "difficult" is not inaccurate, but certainly inadequate.
>
> The evidence established that Hodge's mother, Kate, was married to six different men, all of whom were substance abusers and some of whom were physically abusive to Kate. She married Billy Joe when Hodge was eight years old. The majority of Hodge's evidence concerned the extreme violence he suffered at the hands of his stepfather. Again, the trial court's description of Billy Joe as "particularly abusive" is insufficient.
>
> Billy Joe was described by at least four witnesses as a "monster." His rage was explosive and violent, often triggered by Kate's shows of affection towards her children. At other times, he was incited for no apparent reason and the household lived in constant fear as a result. He would regularly rape Kate, threaten her with a gun, and beat her. On one occasion, Billy Joe assaulted Hodge's mother so

violently that she suffered a miscarriage. Hodge's sisters testified that, more than once, they thought Kate had been beaten to death.

Hodge's mother and sisters agreed that Billy Joe was more violent and abusive towards [Hodge] than any other person in the house. This is perhaps because Hodge, being the only male child in the home, often tried to defend his mother and sisters from physical attacks. He was regularly beaten with a belt and metal buckle, which left bruises and welts on his body that were observed by family members and neighbors alike. At other times, he was kicked, thrown against walls, and punched. Hodge's half-sister specifically recalled an occasion when Billy Joe rubbed Hodge's face in his own feces. His sisters testified that Billy Joe made [Hodge] watch while he brutally killed [Hodge's] dog. Because his mother, who was evidently paralyzed by fear and substance abuse, refused to protect Hodge, he often ran away from home.

School records indicate that Hodge was of normal intelligence and received average grades through elementary school. After Billy Joe entered the home, his grades declined, he became withdrawn, and he was often truant. He began stealing at the age of twelve and was sentenced to a juvenile detention facility when he was fifteen.

There was testimony that, at the Tennessee residential facility, Hodge was subjected to regular beatings. He escaped from the facility twice and once refused to return after a furlough. After finally being released at the age of sixteen, Hodge assaulted his stepfather, which resulted in his return to the juvenile facility until he was eighteen years old.

At the age of twenty, Hodge pled guilty to his first felonies: burglary and grand larceny. He escaped from custody four days later. Following his capture and eventual parole, he was convicted of a separate armed robbery. Again, he escaped and was recaptured. After serving nearly eight years in prison for that felony, Hodge was again paroled. He was thirty-four years old at the time he killed Tammy Acker. He had been married three times and had fathered three children.

At the evidentiary hearing, Hodge presented the expert opinions of two psychologists, both of whom had assessed him in 2009. Both agreed that the violence in Hodge's childhood home was ruinous to his development and compounded by the physical abuse occurring at the Tennessee residential facility. One of the psychologists diagnosed Hodge with post traumatic stress disorder (PTSD) and opined that it was present at the time of Hodge's crimes and trial. This expert further testified that PTSD can render a person violent, hypervigilant, aggressive, and erratic. Both psychologists found it particularly interesting to note that Hodge did not inflict any abuse on his own children and was described by all as a loving father.

*Hodge*, 2011 WL 3805960, at *3-4.

However, the Kentucky Supreme Court concluded that Hodge was not prejudiced by his counsel's failure to introduce this mountain of evidence:

> We have considered the totality of evidence before Hodge's sentencing jury, including the proposed mitigation evidence. Balancing all of the available evidence in mitigation and aggravation, we are compelled to reach the conclusion that there exists no reasonable probability that the jury would not have sentenced Hodge to death. There is no doubt that Hodge, as a child, suffered a most severe and unimaginable level of physical and mental abuse. Perhaps this information may have offered insight for the jury, providing some explanation for the career criminal he later became. If it had been admitted, the PTSD diagnosis offered in mitigation might have explained Hodge's substance abuse, or perhaps even a crime committed in a fit of rage as a compulsive reaction. But it offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge. Many, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods. Even if the sentencing jury had this mitigation evidence before it, we do not believe, in light of the particularly depraved and brutal nature of these crimes, that it would have spared Hodge the death penalty.

*Id.* at *5 (internal citations omitted).

## II.

To prevail on a habeas claim premised on the ineffective assistance of counsel (IAC), Hodge must satisfy the two-part test set forth in *Strickland*, 466 U.S. at 687, by showing "that [his] lawyers performed well below the norm of competence in the profession and that this failing prejudiced [his] case." *Caudill v. Conover*, 881 F.3d 454, 460 (6th Cir. 2018) (citing *Strickland*, 466 U.S. at 687). Because the Kentucky Supreme Court has already rejected Hodge's IAC claim, the Antiterrorism and Effective Death Penalty Act (AEDPA) requires that he also demonstrate that the Kentucky Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state-court decision is "contrary to clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law,' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at' an opposite

result." *Carter v. Mitchell*, 829 F.3d 455, 468 (6th Cir. 2016) (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

## A.

All agree that Hodge's trial counsel had a duty to reasonably investigate and present a mitigation case, *see Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (citing *Strickland*, 466 U.S. at 691), and because counsel failed to do so, his performance was constitutionally ineffective. *Hodge*, 2011 WL 3805960, at *3. Thus, only *Strickland*'s prejudice prong is at issue here, and it is on this point alone that Hodge must demonstrate that the Kentucky Supreme Court acted in a manner contrary to clearly established federal law.

In assessing prejudice, the Kentucky Supreme Court was entitled to weigh the mitigating and aggravating evidence, and even to take into account the fact that the mitigation evidence does little to explain the crime. *Thornell v. Jones*, 602 U.S. 154, 166 (2024). Such a determination would normally be entitled to AEDPA deference. But here, the court's prejudice analysis rested on a determination that, in instances of particularly brutal or premeditated murder, evidence of the defendant's difficult upbringing has mitigation weight only to the extent that it offers a "rationale" for the murder, and, therefore, can sway the jury only if it explains the crime. The Kentucky Supreme Court thus categorically differentiated the "many, if not most, malefactors" who have "terrible childhoods" from those malefactors whose childhoods have potential mitigation weight in swaying a jury on the sole ground that those whose terrible childhoods might sway a jury are those whose childhoods explain the crime. This reasoning is contrary to established Supreme Court precedent applying *Strickland*'s prejudice prong.

In *Williams*, 529 U.S. at 395, the defendant "had been severely and repeatedly beaten by his father" and "committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home)." The Supreme Court determined that "the graphic description of [the defendant's] childhood, filled with abuse and privation, . . . might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398. Importantly, the Court also stated that such evidence "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* In

other words, evidence may have weight even if it does not explain the crime or undermine any of the aggravating factors. The Court concluded that because the state supreme court "did not entertain that possibility," it "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel." *Id.*

In *Wiggins*, the Supreme Court held that a Maryland death-row inmate, who was found guilty of drowning a seventy-seven-year-old woman in her bathtub, was prejudiced by counsel's failure to produce evidence of a childhood characterized by extreme neglect and physical and sexual abuse. *See* 539 U.S. at 538. Although the crime was deeply disturbing, the Court explained that evidence of the defendant's extremely difficult childhood, taken with other mitigating evidence, "'might well have influenced the jury's appraisal' of Wiggins' moral culpability." *Id.* (quoting *Williams*, 529 U.S. at 398). The Court did not discount this evidence despite there being little apparent connection between Wiggins's childhood and the crime he committed.

Similarly, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court considered whether a Pennsylvania death-row inmate was prejudiced by his counsel's failure to investigate and present mitigation evidence that the defendant had grown up in a dysfunctional home similar to Hodge's, had endured extreme abuse as a child, and had significant mental-health problems likely resulting from the abuse. *Id.* at 391-93. Rompilla's crime was brutal: he was found guilty of murdering a bar owner during a burglary by stabbing him and setting him on fire, and the jury specifically found that Rompilla committed the murder by means of torture. *Rompilla v. Horn*, 355 F.3d 233, 236-38 (3d Cir. 2004). Rompilla also had a history of violent felonies, including a conviction for a factually similar crime in which he had burglarized a bar after closing, raped the bar owner, and "slashed her with a knife." *Id.* at 237. Nonetheless, the Supreme Court concluded that although it was "possible that a jury could have heard [the mitigating evidence] and still have decided on the death penalty," the "mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Rompilla's culpability, and the likelihood of a different result if the evidence had gone in [was] sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (internal quotation marks and citations omitted). The facts of Rompilla's conviction were undeniably brutal, and his

mitigation evidence did nothing to explain the crime. But once again, the Supreme Court afforded considerable weight to the mitigating evidence.

**B.**

The Kentucky Supreme Court's refusal to consider the other purposes of mitigation evidence—beyond explaining the crimes—overlooks the long-recognized understanding in death-penalty cases that evidence that does not explain the crime may still explain the person who committed the crime in a way that softens the jury's impressions of him. *See Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (explaining that the purpose of mitigation evidence is for "the jury to give 'a reasoned *moral* response to the defendant's background, character, and crime'" (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 184 (1988) (emphasis in original) (O'Connor, J., concurring in judgment))). The Kentucky Supreme Court's decision conflicts with the Supreme Court's decisions in *Wiggins*, 539 U.S. at 538, *Rompilla*, 545 U.S. at 393, and *Williams*, 529 U.S. at 398.

*Williams*, *Rompilla*, and *Wiggins* were all decided before 2011, when the Kentucky Supreme Court issued its decision in Hodge's case. Thus, their holdings constitute clearly established federal law for the purposes of our AEDPA analysis. Supreme Court cases on prejudice can be relevant to our analysis, not only insofar as they demonstrate the ways a state court can unreasonably apply *Strickland*, but also because a state court can act contrary to or unreasonably under the holdings of the cases themselves. When the Supreme Court "relies on a legal rule or principle to decide a case, that principle is a 'holding' of the Court for purposes of AEDPA." *Andrew v. White*, 145 S. Ct. 75, 81 (2025). *Williams*, *Rompilla*, and *Wiggins* all relied on the legal principle that mitigation evidence that does not explain the crime can have weight for other purposes, and, indeed, can have enough weight to outweigh evidence of a particularly brutal crime.

*Williams* is also instructive in another respect. In *Williams*, the Court found that the Virginia Supreme Court applied the wrong standard in considering prejudice. *See* 529 U.S. at 393 ("[T]he Virginia Supreme Court read our decision in [*Lockhart v. Fretwell*, 506 U.S. 364 (1993)] to require a separate inquiry into fundamental fairness even when Williams is able to

show that his lawyer was ineffective and that his ineffectiveness probably affected the outcome of the proceeding."). In particular, the Virginia Court imposed an additional requirement on mitigation during the prejudice phase of the *Strickland* analysis. *Id.* 392-94. And the Supreme Court held that such an imposition was contrary to federal law, even though the state court had correctly identified the *Strickland* standard. *Id.*

Similarly, in this case, the Kentucky Supreme Court applied an incorrect standard by dismissing all mitigation evidence that did not explain the crimes. Although a state court's weighing of aggravating and mitigating factors is entitled to deference and may not be disturbed unless unreasonable "beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 562 U.S. 86, 103 (2011), a state court is not entitled to add an extra legal requirement to the Supreme Court's well-established *Strickland* framework, *Williams*, 592 U.S. at 392-94. This is a crucial distinction. Had the Kentucky Supreme Court conducted a proper weighing analysis and concluded that the aggravating factors outweighed the mitigating evidence, there would be no issue. But the Kentucky Supreme Court's application of a rule that evidence regarding a defendant's horrific upbringing can outweigh the aggravating factor of a particularly violent and cold-blooded crime only where the defendant's background provides a "rationale" for the crime resulted in a prejudice analysis that conflicts with Supreme Court precedent. As Justice Sotomayor observed in her dissent from the denial of certiorari in Hodge's state case, "[t]he Kentucky Supreme Court's brief discussion of the weight and impact of Hodge's mitigation evidence reasonably suggests that its prejudice determination flowed from its legal errors." *Hodge v. Kentucky*, 133 S. Ct. 506, 510 (2012) (Sotomayor, J., dissenting from denial of certiorari). That error, rather than the weight the Kentucky Supreme Court accorded to the aggravating and mitigating evidence, is what makes the court's decision contrary to established Supreme Court precedent.

Further, the *Williams* Court determined that, in addition to applying the wrong standard, the Virginia Supreme Court was unreasonable in looking to the omitted mitigation testimony's relevance to the defendant's dangerousness only, without recognizing its relevance to moral culpability. 529 U.S. at 397-98. Agreeing with this conclusion, Justice O'Connor stated that

"[t]he Virginia Supreme Court's decision [finding a lack of prejudice] reveals an obvious failure to consider the totality of the omitted mitigation evidence." *Id.* at 416.

In sum, because the Kentucky Supreme Court applied a prejudice standard that is contrary to the Supreme Court's cases explaining the importance of mitigation evidence to the perception of a death-row inmate's moral culpability, there has been no proper application of the prejudice prong to which to apply AEDPA deference.

## C.

The majority argues that the Kentucky Supreme Court did not apply an improper nexus requirement, analogizing to the Supreme Court's recent holding in *Thornell v. Jones*, 602 U.S. 154, 166 (2024), that mitigating evidence lacking a "causal connection" to a crime carries little weight (citation omitted). To be sure, mitigation evidence may have more significant weight if it can explain the crime, making the question whether the evidence explains the crime a relevant one. *Porter v. McCollum*, 558 U.S. 30, 43 (2009). And mitigation evidence that does not explain the crime is less weighty than it would be if it did. *Thornell*, 602 U.S. at 166-68. But that does not mean that explaining the crime is the only weight mitigation evidence can have. Otherwise, such evidence would be irrelevant if it does not explain the crime, and that is not the law. *See Smith v. Texas*, 543 U.S. 37, 45 (2004). And though *Thornell* and *Porter* allow a court to treat non-explanatory evidence as less weighty than similar explanatory evidence, they do not allow a court to disregard out of hand any weight mitigating evidence might have apart from its ability to explain the crime. To do so would be directly in conflict with *Smith* and *Williams*, and the Supreme Court does not overrule itself silently. *Rodriguez de Quijas v. Sherson*, 490 U.S. 477 (1989). Here, the Kentucky Supreme Court did more than conclude that the mitigating evidence would not have affected the outcome of the trial; it determined that evidence of Hodge's childhood trauma could sway the jury *only* to the extent that it caused the crime in some way, because the mitigation evidence has weight *only* for the purpose of explaining the crime.

A close look at *Thornell* demonstrates the flaw in the majority's analogy. In that case, the defendant claimed that his newly proffered evidence showed that he suffered from PTSD, ADHD, a mood disorder, and bipolar depressive disorder. *Id.* at 166. The Supreme Court

concluded that it was "not reasonably likely that this evidence would have resulted in a different sentence." *Id.* It reasoned that the Arizona courts had already received testimony that the defendant suffered from a serious mental illness but had "declined to give this evidence much weight because [defendant] did not establish a causal connection between his alleged mental illness and his [criminal] conduct." *Id.* (citation and internal quotation marks omitted).

This determination does not control the outcome here, in a case involving severe childhood abuse, which the Supreme Court has concluded "might well have influenced the jury's appraisal of [the defendant's] moral culpability," even where it does not explain the crime, *Williams*, 529 U.S. at 398. Indeed, the Court in *Thornell* explored how newly introduced evidence of cognitive impairment caused by physical trauma, which did not explain the defendant's crimes, might nonetheless be "helpful" and have "some mitigating weight" (although it ultimately rejected that evidence as cumulative and uncorroborated). *Thornell*, 602 U.S. at 167-68. This confirms that, while such evidence might have less weight than it would if it did explain the crime, it still has weight unconnected to its explanatory value—weight which must be considered on its own terms. The very fact that the Court in *Thornell* felt the need to explore each piece of mitigating evidence that did not explain the crime and reject it as uncorroborated or cumulative rather than simply writing off all nonexplanatory evidence as unconnected to the crime—as the Kentucky Supreme Court did—demonstrates the impropriety of the Kentucky Supreme Court's mode of analysis. *Id.*

*Thornell* is also distinguishable from this case in that it relied heavily on Arizona law. The Court concluded that testimony regarding the defendant's mental illnesses that did not link the illnesses to his crimes "would have done him little good in the Arizona courts," citing an Arizona Supreme Court case holding that "evidence of causation is required before mental impairment can be considered a significant mitigating factor." *Id.* at 167 (citation omitted). No such state law is involved here.

**D.**

The majority additionally contends that the premise of Hodge's argument—that the Kentucky Supreme Court imposed a nexus requirement—mischaracterizes the state court's

opinion.  But the state court's analysis of the proposed mitigation evidence was clear. The Kentucky Supreme Court's rejection of the mitigation evidence was solely based on a single factor: the mitigation evidence's inability to explain the crime. The Court wrote: "*It offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge.* Many, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods." *Hodge*, 2011 WL 3805960, at \*5 (emphasis added).  As a result, we are left with no possible conclusion other than that the court determined that the mitigation evidence had relevance only to the extent that it explained the crimes and completely dismissed mitigation evidence that did not do so.

The majority and concurrences contend that the Kentucky Supreme Court merely balanced the severity of Hodge's crimes against the mitigation evidence, and reduced the weight it gave that mitigation evidence in that balancing.  But the Kentucky Supreme Court's statement that the mitigation evidence "offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims," as the sole rationale for disregarding the evidence, in combination with the court's comment that "many, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods," *Hodge*, 2011 WL 3805960, at \*5, demonstrates that the court was imposing an additional requirement that the evidence go beyond the evidence of a "terrible childhood" and "provide a rationale" for the crime. The Kentucky Supreme Court was not merely considering Hodge's crimes as a factor in its decision, but rather was dismissing mitigation evidence that failed to explain the crimes. As explained, dismissing such evidence merely because it does not provide a rationale for the crimes runs contrary to the Supreme Court's holdings in *Wiggins*, 539 U.S. at 538, *Rompilla*, 545 U.S. at 393, and *Williams*, 529 U.S. at 398.

## III.

Because the state court's reasoning was "contrary to" clearly established federal law, the prerequisites to habeas relief found in § 2254(d) are met and de novo review of the prejudice prong of the *Strickland* analysis is appropriate. *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006).  Hodge must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death." *Shinn v. Kayer*, 592 U.S. 111, 117-18 (2020) (quoting *Strickland*, 446 U.S. at 695). Where, as here, the unanimous jury submitted a recommendation for the death penalty, this means that Hodge must demonstrate "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. The chance one juror would have voted against death "must be substantial, not just conceivable," *Richter*, 562 U.S. at 112, and must be demonstrated with "evidence that 'differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing,'" *Caudill*, 881 F.3d at 464 (alteration in original) (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)).

I would find that, applying the proper standard for prejudice, Hodge made this showing. This is not a case arguing that the jury's decision may have been different if defense counsel had developed the mitigation evidence more thoroughly. *See, e.g.*, *Byrd v. Collins*, 209 F.3d 486, 497, 526-27 (6th Cir. 2000) (affirming denial of habeas relief where the trial court was presented with "evidence of Petitioner's unhappy childhood, lack of paternal love and affection, and some degree of abuse," but the petitioner argued that "counsel was ineffective for failing to present sufficient mitigation evidence and obtain the assistance of an independent psychologist"); *Halvorsen v. White*, 746 F. App'x 489, 503-05 (6th Cir. 2018) (affirming denial of habeas relief where the petitioner argued that his counsel presented insufficient evidence of his brain damage from years of drug abuse, but "[a]t the penalty phase, trial counsel introduced additional evidence of [the petitioner]'s substance abuse through several witnesses"). Rather, at the sentencing phase, the judge and jury "heard almost nothing that would humanize [Hodge] or allow them to accurately gauge his moral culpability." *Porter*, 558 U.S. at 41. Defense counsel in this case provided *no* evidence at all of the extensive and severe trauma Hodge experienced as a child.

And, the unheard mitigation evidence here was substantial and significant. Hodge suffered from "a most severe and unimaginable level of physical and mental abuse" during his childhood and adolescent years. *Hodge*, 2011 WL 3805960, at *5. As in *Wiggins*, "[h]ad the jury been able to place [Hodge's] excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."

539 U.S. at 537. Thus, there is no question that the mitigation evidence that was presented at Hodge's postconviction hearing "differ[ed] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing," *Caudill*, 881 F.3d at 464 (alteration in original) (citation omitted).

I do not contend, and do not understand Hodge to be arguing, that "if it can be shown that trial counsel failed to produce any mitigating evidence that can be characterized as substantial, [Hodge] must be resentenced." *Majority Opinion* at 23 (citation and internal quotation marks omitted). That is clearly not the law; rather, a showing of prejudice is required. And the failure to produce mitigation evidence that is substantial is not per se prejudicial, as shown by the cases discussed above.

*Thornell* supports, rather than precludes, a finding of prejudice here. The Court in *Thornell* noted that "[i]n each of the ineffective-assistance-of-counsel cases on which the Ninth Circuit relied [in finding prejudice], this Court found that defense counsel introduced little, if any, mitigating evidence at the original sentencing." 602 U.S. at 171 (citing *Porter*, 558 U.S. at 41; *Williams*, 529 U.S. at 395–98; *Rompilla*, 545 U.S. at 378, 393; *Wiggins*, 539 U.S. at 515, 534–35). It distinguished the facts in *Thornell*, noting that the defendant had "started with much more mitigation." *Id.* Hodge's case is more like *Porter*, *Williams*, and *Rompilla* in that defense counsel introduced no mitigation evidence at all.

The majority asserts that the Supreme Court's holding in *Shinn v. Kayer*, 592 U.S. 111 (2020) dictates that we affirm the district court's finding of a lack of prejudice. But the defendant in *Kayer* did not experience severe child abuse like Hodge did. The original trial record in *Kayer* indicated "that there was a family history on both sides of alcoholism[,] that there was a history of mental illness[,] . . . that [the defendant] was slow to develop as a child[,]" and that the defendant "grew up with significant instability including frequent moves and his father's sudden death when [the defendant] was still very young." *Kayer v. Ryan*, 923 F.3d 692, 697 (9th Cir. 2019) (internal quotation marks omitted). To this, post-conviction counsel added four categories of evidence: "evidence that he was addicted to alcohol and gambling; evidence that he had suffered a heart attack about six weeks before the murder; evidence of mental illness, including a diagnosis of bipolar disorder; and evidence that members of his family had suffered

from similar addictions and illnesses in the past and that this had affected his childhood." *Kayer*, 592 U.S. at 115. Several of these categories overlapped with the evidence of mitigation presented at trial.

Although the evidence presented in *Kayer* was significant, it was very different from the evidence Hodge presented. First, Hodge's new evidence was markedly different from the single sentence of mitigation evidence actually presented at trial, and second, Hodge's new evidence demonstrated challenges in Hodge's childhood that far eclipsed those faced by Kayer. *Kayer*, therefore, does not control the outcome here. Indeed, cases such as *Wiggins*, 539 U.S. at 538 and *Rompilla*, 545 U.S. at 393 suggest that the Supreme Court views severe abuse as distinct from other types of childhood difficulties in its ability to mitigate a defendant's crimes. To be sure, as the majority notes, the facts of *Wiggins* and *Rompilla* are not on all fours with those in this case—the defendant in *Wiggins* had no aggravating factors or history of violence, 539 U.S. at 537, and the defendant in *Rompilla* had a learning disability that prevented him from understanding that his conduct was criminal, 545 U.S. at 392. But these differences do not negate the fact that evidence of severe childhood abuse could have influenced the jury in this case as well.

Finally, the majority points to the Kentucky Supreme Court's statement that "the evidence of Hodge's abusive childhood would have also included the damaging evidence of his long and increasingly violent criminal history, his numerous escapes from custody, and the obvious failure of several rehabilitative efforts." *Hodge*, 2011 WL 3805960, at *4. But the likelihood that the state would have provided additional damaging information in response to any mitigation evidence does not render counsel's failure harmless. *Foust v. Houk*, 655 F.3d 524, 546 (6th Cir. 2011) ("Powerful aggravating circumstances, however, do not preclude a finding of prejudice. . . . The new evidence about Foust's family history is overwhelming, and it undermines reasonable confidence in the reliability of Foust's death sentence."). As in *Williams*, 529 U.S. at 396, "the failure to introduce the comparatively voluminous amount of evidence that did speak in [Hodge's] favor was not justified by a tactical decision to focus on" the possibility of damaging evidence being introduced.

**IV.**

For these reasons, I would reverse the district court's denial of habeas relief and would direct that Kentucky either provide Hodge with a new penalty-phase trial or amend his sentence to life imprisonment.